859 A.2d 210

**Anthony Rodney ARCHER**

v.

**STATE of Maryland.**

**No. 119, Sept. Term, 2003.**

Court of Appeals of Maryland.

Oct. 7, 2004.

330

332

334

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

Appellant, Anthony Rodney Archer ("Archer"), asks this Court to determine the extent to which a trial judge may compel a recalcitrant witness to testify when that witness refuses to testify at trial. We review this matter in the context of Archer's appeal from his convictions for felony murder and attempted murder. He poses the following question for our review:

> [Did] the trial court err[ ] by threatening the reluctant State's witness Lewis Bailey with prosecution for contempt and by suggestion to Mr. Bailey and his counsel that he could avoid the contempt prosecution by testifying inconsistently with his prior testimony, thereby allowing the State to introduce that prior testimony under *Nance.*[1]

We shall hold that a trial court's warning to a reluctant witness concerning contempt sanctions or the penalties of perjury is not, *per se,* a due process violation. In this case,

---

[1]. *Nance and Hardy v. State,* 331 Md. 549, 629 A.2d 633 (1993) (hereinafter *Nance*).

the trial judge's admonition to the witness was not given *in a judicious manner* and was otherwise excessive. Specifically, it was improper for the trial judge either to advise the witness on how he could testify or to orchestrate a hearing on contempt, by inviting another member of the bench to try and convict the witness for contempt of court, under circumstances that would undermine the impartiality of the judges and the integrity of our criminal justice system. We do not approve of the techniques employed by the trial judge to persuade the witness to testify. The trial judge's repeated admonition to a recalcitrant prosecution witness that he testify, irrespective of the witness's obligation to testify truthfully, coupled with threats of contempt and possible imposition of the "longest possible sentence the law allows," probably caused the witness to change his testimony. Because of the trial judge's behavior in this case, Archer's right to a fair trial was, therefore, violated.

I.

Archer was convicted by a jury in the Circuit Court for Baltimore City, (Prevas, J. presiding), and sentenced as follows: (1) life imprisonment for felony murder; (2) life imprisonment to be served consecutively for attempted first degree murder; and (3) two sentences of twenty years to be served consecutively for two counts of the use of a handgun in a crime of violence. The remaining convictions were merged for sentencing purposes.

Archer's convictions stem from an incident that occurred in the early morning hours of September 12, 1997. Rudolph Lyons ("Lyons"), William Faulkner ("Faulkner"), and Eric Gardner ("Gardner"), were walking near Lexington Market in Baltimore City. They were returning to their car after getting something to eat at Crazy John's when they noticed three men approaching. The three men approaching were Archer, Lewis Bailey ("Bailey"), and Keith Edmonds ("Edmonds"). A fight ensued when Archer pulled a gun, placed it to Lyons's stom-

ach, and attempted to remove Lyons's necklace. Shots were fired by men on both sides.

At Archer's trial, Lyons described the events as follows:

As how we were lined up, they were lined up the same way. As if we was playing basketball, was 3 on 3, man on man. It was a man on man situation. And I looked and I see the three people coming towards us. And I noticed one of them had a gun in their pocket, the guy in the middle. I could see that he had a gun in his pocket. And when I saw that, I paused and I, after I paused, I kept walking and then, as we met up, I tried to walk through them. But the guy that was in the middle had gave me a shoulder as if to stop me and the guy that was in front of me had pulled his gun out and stuck it in my stomach and told me you all know what time it is. And while he was sticking the gun in my stomach, he was reaching for my necklace to try to take my necklace off. And so, whereas he was turning my necklace, I grabbed his arm which he was holding the gun at my stomach and moved the gun away from my stomach because I knew they were going to shoot. So, as I got the gun away from my stomach and we got to tussling. And, as soon as that happened, shots just rang out and within the first couple of shots, I got hit and fell to the ground and I busted my head on the concrete. And when I rolled over, I noticed that I was shot in my shoulder. I looked at my shoulder. When I looked up, the guy I was tussling with was standing over the top of me—he looked to his left and then he looked to his right, and looked me in my eyes and [ ] pulled the trigger and shot me in my face. And after he shot me, my head hit the ground and I opened my left eye. I looked at him he ran. After he shot me, he ran in the direction towards Crazy John's away from the 7–11, going in that direction.

Lyons was treated at the Shock Trauma Unit at the University of Maryland Hospital. He identified Archer as the man who shot him in the face. His shoulder injury was later determined to have been caused by Bailey. Gardner died at the scene. Faulkner testified that when he saw a gun he ran away from the scene. Someone "shot after him" but missed.

He returned to the scene when the police arrived and gave a statement.

Shortly after the shooting, the police received a call from Shock Trauma informing them that two men were seeking treatment for gunshot wounds. The police responded to the call and subsequently arrested Edmonds and Bailey. Archer was not arrested at that time.

In 1999, Bailey and Edmonds were tried as co-defendants for the events of September 12, 1997. Before the trial was over, Bailey accepted a plea agreement and pled guilty to the murder and attempted robbery of Gardner. He received a life sentence with all but 15 years suspended in exchange for agreeing to testify against Edmonds and Archer. Edmonds's trial continued and he was convicted of felony murder, attempted second degree murder, and related charges. *Edmonds v. State*, 138 Md.App. 438, 771 A.2d 1094, *cert. denied*, 365 Md. 474, 781 A.2d 779 (2001).

As part of his plea agreement, Bailey informed the police that while he did not know the full name of the third assailant who participated in the crime with him and Edmonds, he was able to provide the police with a description and a location of where Archer might be found. On December 9, 1999, more than two years after the shooting, both Lyons and Faulkner identified Archer, in a station-house line-up, as the third assailant.

Initially, Archer was tried on February 15, 2001. That trial ended in a mistrial when Bailey refused to testify. His second trial, the one in question here, began on June 24, 2002. At the beginning of the trial, counsel for Bailey informed the trial court that Bailey was unwilling to testify. Bailey alleged that he had been stabbed in prison for having testified against Edmonds and he was afraid to testify against Archer. It is the efforts of the trial court to persuade Bailey to testify that is the basis of this appeal.

The following colloquy occurred prior to opening statements in Archer's trial:

The Court: Before we make opening statements, we wanted to resolve the issue of Mr. Bailey.

The State: That's correct.

The Court: Howard Cardin, who represents Mr. Bailey and who negotiated a plea agreement, is present. Mr. Cardin, you want to indicate on Mr. Bailey's behalf what he intends to do?

Mr. Cardin: Good morning, your honor, Howard Cardin. I do represent Mr. Bailey. I did have the opportunity of speaking to Mr. Bailey in the lineup[sic]. It is my understanding that Mr. Bailey refuses to testify because of fear for his life. He's incarcerated and has been stabbed and he believes that—

The Court: He understands he has no privilege against self-incrimination? He understands that, correct?

Mr. Cardin: I explained that to him, there might be a question as to the right against self-incrimination in the event his testimony is varied from the testimony from the previous trial. There might be a possibility of perjury.

The Court: I don't think you can assert self-incrimination for perjury under the *Troy* case. He's immune from anything other than perjury and contempt. Is that correct, Ms. Handy?

The State: That's my understanding, your honor.

The Court: All right. If he refuses to testify, then I'll immediately have you and Mr. Bailey taken before Judge Themelis. Ms. Grunwell will be the prosecutor and we'll try him for contempt.

The State: Actually, I had spoken with Mr. Cohen about it.

The Court: Mr. Cohen will prosecute him before Judge Themelis and Judge Themelis will give him the longest possible sentence the law allows him to give and then maybe he'll change his mind about refusing to testify. Otherwise, all he has to do is get on the stand and answer the questions. If they are favorable to the defendant, then Ms. Handy will just cross-examine him with anything he said unfavorable in the past. So, consult with

him one last time as to whether he wants to have a contempt trial or whether he will take the stand, understanding his reluctance. And I can tell the jury how reluctant he is.

\* \* \* \*

Mr. Cardin: Mr. Bailey has asked me to ask the Court to explain the term, giving him the most time that is possible.

The Court: There is no statutory maximum for contempt and, obviously, Judge Themelis is not going to take a court trial and limit him to six months. He's going to give him, if the jury convicts him, a sentence—I guess the only limitation is anything that is not cruel and unusual punishment. So theoretically, Judge Themelis could give him a life sentence for contempt. Whether the Court of Appeals would allow it to stand is another story, but, theoretically, that is the longest sentence he can probably get.

Whereupon, there was a pause in the proceedings.

The Court: What is Mr. Bailey prepared to do?

Mr. Cardin: Mr. Bailey believes he will not testify. He believes it is in his best interest. That is his decision.

The Court: Let me have the phone.

Whereupon Judge Prevas called Judge Themelis on the phone, in open court and on the record. Because the conversation took place over the phone, the transcript only indicates one half of the conversation.

The Court: John, sorry to bother you. Can you, in the next day or so, interrupt what you're doing and try a contempt jury for me? Okay. Okay. Basically, Mark Cohen will prosecute for the State and Howard Cardin represents the defendant. The defendant made a plea agreement in 1997 to testify against a third co-defendant in a murder case and got his time, life, serve the first 15, something like that. Now it's a couple of years later, he's been stabbed in prison and he doesn't want to testify. So I'm going to start my opening statements in my trial and if

you can try him and sentence him on the contempt, maybe he'll change his mind after he's sentenced. Or, if he changes his mind before trial starts, then he can come back and testify. So, can I have Mark Cohen and Howard Cardin report to you?

Whereupon there was another pause in the proceedings. The court continued:

The Court: Even so, take that and do this first and do that second. Yeah. Also, to get background on this case, look at *Edmonds v. State,* [138 Md.App. 438, 771 A.2d 1094 (2001)] That's a co-defendant that didn't plead and that will give you the whole factual history of the case, okay? I'll send them over, thank you.

Mr. Cardin then informed the court:

Mr. Cardin: Your honor, with all due respect, I will ask Judge Themelis for the opportunity to prepare a defense.

The Court: He's got to weigh that against the fact that I need to start this trial. And the only time that the contempt had been effective is if, in fact, if he's convicted and sent[enced], he may change his mind before sentencing or after sentencing, to testify.

Mr. Cardin: I understand that, but since he is facing a significant sentence, he has a right to prepare a defense in his case. The question also might be whether or not I had been a witness in that particular case as opposed to counsel.

The Court: You can litigate all of that before Judge Themelis.

Mr. Cardin: I will be glad to take it up before Judge Themelis, I don't want your honor to think we're coming up with something.

The Court: Let me advise him of one last thing that saves him and you all this trouble. You've read Chief Judge Murphy's pocket part on *Nance–Hardy* and the turn-coat witness. Basically, if he testifies favorably to the defendant, there is nothing anybody can do to punish him for that and the State still can cross-examine him about

anything he might have said unfavorably in the past. So, if instead of refusing to testify, he gets on the stand and tries to help the defendant, the defendant benefits and the State benefits. So, he may want to do that rather than run the risk of getting a life sentence from Judge Themelis.

Mr. Durkin [2]: At this point, Judge, I have to object.

The Court: The basis?

Mr. Durkin: Basically, you are trying to coach this defendant to say something that's not true.

The Court: I don't know what's true and not true.

Mr. Durkin: I would object, your honor.

The Court: He made a plea agreement. He swore under oath that a certain set of facts were true and the mechanism for getting him to repeat those facts at this point, is to sentence him for contempt. What I'm saying is, if his fear is that he doesn't want to offend you, then he may be able to avoid the contempt by doing something more favorable to you. So, if that coaching is illegal, then I'll take the opinion. I'm only in doubt as to what five judges of the Court of Appeals will say. I know Bell and Eldridge will say it is. But, I think that they'll probably be overruled in a 5 to 2 majority. And if it says you can't do that, then I'll just put it over the head stand of my bed, and when I wake up in the morning, I'll genuflect before it.

Mr. Durkin: What I'm saying, Judge, I don't think that advice is proper coming from the bench.

The Court: Let the Court of Appeals decide it. I think they'll decide it 5 to 2 against you. I've given you the practical solution, and if it is unconstitutional, let's see how far we dig into the Magna Carta to think up the reason why it is.

Bailey refused to testify and was told by the court to "report to Judge Themelis and report back here if he changes

---

2. Mr. Durkin represented Archer during the trial.

his mind or after he's convicted." The record is unclear as to whether Bailey pled guilty to the contempt charge or if he chose to testify in lieu of the contempt proceedings. Bailey, however, returned to Judge Prevas's court and agreed to testify because he felt "he had no choice but to testify."[3]

Prior to Bailey taking the stand, counsel for Archer again objected to the earlier colloquy regarding Bailey's options. The court reiterated that it believed the colloquy was within its authority and cited extensively from case law to support its position.[4] The court concluded that,

> as long as you have the right to confront the witness under the confrontation clause and cross-examine him, then whether I compel him by advising him he has no self-incrimination privilege or by giving him immunity or by trying him for contempt or by telling him the penalties of contempt that can be given by another judge after a full hearing on contempt, it seems to me that no due process is violated and no right of yours is implicated in any way.

The court overruled Archer's objections and denied the motion for a mistrial.

Bailey then took the stand and testified inconsistently with his testimony in Edmonds's trial. The most notable distinction was his testimony in Archer's trial that it was Edmonds's idea to rob people that night, whereas in Edmonds's trial he stated that it was Archer's idea. On appeal, the Court of Special Appeals held that the trial court's comments "were intemperate" and "may have been inartful, and capable of being misunderstood out of context," however, because the court correctly identified the law regarding Bailey's options,

---

3. Bailey testified that Judge Themelis informed him that unless he agreed to testify in Archer's trial, he would be prosecuted for contempt and could face 20 years if convicted.

4. The case law cited by the court included cases discussing prosecutorial "horse shedding" of a witness before trial, applicability of the exclusionary rule and privilege against self-incrimination during grand jury proceedings, appropriateness of allowing a witness to invoke the Fifth Amendment before a jury, and *Nance.*

there was no reversible error. We granted Archer's petition for a writ of certiorari to review the impact of the trial judge's remarks and conduct on Archer's right to due process of law. *Archer v. State,* 379 Md. 224, 841 A.2d 339 (2004).

## II.

We begin by noting that Bailey was a compellable witness because no appeal or sentence review was pending and the time for appeal and sentence review had expired. *Ellison v. State,* 310 Md. 244, 259, 528 A.2d 1271, 1278 (1987) (holding that "under the Fifth Amendment and Art. 22 of the Maryland Declaration of Rights, a witness who has been convicted and sentenced for a criminal offense is entitled to invoke the privilege against self-incrimination with regard to that offense during the thirty-day period for seeking appellate review or sentence review by a three-judge circuit court panel" or during the pendency of the direct appellate or sentence review proceedings). *United States v. Gernie,* 252 F.2d 664, 670 (2d Cir. 1958), *cert. denied,* 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958) (noting that the government had a right to compel a witness to answer questions as he pleaded guilty and could not be further incriminated by answering questions about where he obtained the drugs). Here, Bailey had been convicted, sentenced, and the time for filing an application for leave to appeal his guilty plea had expired. Thus, he had no Fifth Amendment privilege to refuse to testify. Contempt proceedings were, therefore, an appropriate response to Bailey's refusal to testify. *Gardner v. State,* 10 Md.App. 691, 692–93, 272 A.2d 410, 411, *cert. denied,* 261 Md. 724, (1971) (A witness who makes an unprivileged refusal to testify offends the process of the court and is subject to contempt proceedings.).

In *State v. Roll and Scholl,* 267 Md. 714, 298 A.2d 867 (1973), we characterized contempt proceedings as "[o]ne weapon in the court's arsenal useful in defending its dignity...." *Roll and Scholl,* 267 Md. at 717, 298 A.2d at 870. Contempt proceedings are classified as either criminal or civil, although the two categories are not mutually exclusive. *Roll*

*and Scholl,* 267 Md. at 727, 298 A.2d at 875. There are two forms of contempt, direct and constructive. "Direct contempt is committed in the presence of the trial judge or so near him or her as to interrupt the court's proceedings, while constructive contempt is any other form of contempt." *Smith v. State,* 382 Md. 329, 338, 855 A.2d 339, 344 (2004) (internal citations omitted) (holding that it was not error for the trial judge to find the same individual in direct contempt multiple times during the course of a single, continuous proceeding). Civil contempt proceedings were "intended to preserve and enforce the right of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties." *Roll and Scholl,* 267 Md. at 728, 298 A.2d at 876. Criminal contempt, historically, constituted "positive acts which offended the dignity or process of the court. Holding an offending party in contempt of court was designed to vindicate the authority and power of the court and punish disobedience to its orders." *Roll and Scholl,* 267 Md. at 727, 298 A.2d at 875. *See Ashford v. State,* 358 Md. 552, 750 A.2d 35 (2000) (discussing the nature of criminal contempt proceedings and the right to a jury trial). Whereas civil contempt must contain a purge provision, (*Roll and Scholl,* 267 Md. at 728, 298 A.2d at 876), the only limit on the sentence for criminal contempt is that the sentence "be within the reasonable discretion of the trial judge and not cruel and unusual punishment." *Gardner,* 10 Md.App. at 693, 272 A.2d at 411 (quoting *Lynch v. State,* 2 Md.App. 546, 564, 236 A.2d 45, 56 (1967); *Lloyd v. State,* 219 Md. 343, 353, 149 A.2d 369, 375 (1959) (stating that there is no statutory limitation on the sentence for common law offenses beyond the requirement that they not constitute cruel and unusual punishment)).

The second option, according to the trial judge, for the witness to avoid offending Archer and the State, was for Bailey to take the stand and testify "favorably to [Archer]," thereby, subjecting him to cross-examination "about anything he might have said unfavorably in the past" including his prior testimony from Edmonds's trial. This suggestion, apparently, is based on our holding in *Nance.* In our view, the trial judge

went too far in suggesting that Bailey take this course of action. The effect of the trial judge's admonition was to deny Archer his right to a fair trial. We shall explain.

We originally characterized the *Nance* case as "the classic evidentiary problem of the turncoat witness." *Nance*, 331 Md. at 552, 629 A.2d at 635. Two witnesses who had previously given statements to police regarding a murder, recanted their stories when called to testify at the murder trial. We held:

> [T]he factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced.

*Nance*, 331 Md. at 569, 629 A.2d at 643. This holding has since been codified in Md. Rule 5–802.1, which provides in pertinent part:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement. . . .

Judge Moylan, writing for the Court of Special Appeals in a post-*Nance* case, *Stewart v. State*, 104 Md.App. 273, 655 A.2d 1345 (1995), *affirmed* 342 Md. 230, 674 A.2d 944 (1996), described the state of the law following the *Nance* case. He wrote:

> Post-*Nance*, it is no longer true that a party, anticipating that a prospective witness has already turned coat, will, thereby, be guilty of impermissibly calling a witness "who it

knows will contribute nothing to its case." (Internal citation omitted.) Provided that *Nance's* express prerequisites have been satisfied, a party may call a witness, fully anticipating (indeed, even hoping for) a miserable testimonial performance, for the exclusive purpose of using that performance, or non-performance, as the launching pad for the introduction of 1) evidence of a prior identification by that witness, 2) the witness's prior inconsistent statement to the police, 3) the witness's grand jury testimony, or 4) any combination of the foregoing. It is no longer true that such a witness "contributes nothing to the case." Under *Nance,* even a perjurious witness may now, simply by serving as a vehicle or a medium for the introduction of other evidence, contribute a great deal to the case.

*Stewart,* 104 Md.App. at 284–85, 655 A.2d at 1351.

Based on the case law discussed above, we find that the trial court correctly identified Bailey's options: he could refuse to testify and be subject to contempt proceedings or he could testify and be subject to cross-examination. The trial judge, however, went beyond simply informing the witness, in a neutral manner, of his obligation to testify and the consequences of his refusal to testify. We disapprove of the manner in which the trial judge transferred Bailey to Judge Themelis for contempt proceedings, as well as the judge's suggestions to Judge Themelis on how to proceed with the contempt case. Furthermore, we reject the trial judge's decision to advise Bailey about how he could avoid contempt by testifying favorably to the defense and the State. The trial judge departed from a neutral judicial role and acted as an advocate in expressing an opinion to Bailey about how he could testify. Ultimately the trial judge's efforts to compel Bailey to testify were improper in that they influenced Bailey's decision to testify inconsistently. If Bailey had remained steadfast in his refusal to testify, his former testimony would not have been admitted and the State would not have been able to introduce Bailey's prior statements as substantive evidence. *See Nance,* 331 Md. at 569, 629 A.2d 633.

In *Tyler v. State*, 342 Md. 766, 775, 679 A.2d 1127, 1131 (1996), we held that a compellable witness who refused to answer any questions when called by the State on direct examination was not subject to cross-examination, and therefore was "unavailable" because he refused to testify. Under those circumstances, we reasoned that the witness's prior testimony could not be admitted under the applicable hearsay exception because the defendant, Tyler, had no opportunity to cross-examine the witness "when the prior testimony was elicited at [the witness's] separate trial in 1993." Recently, the United States Supreme Court reaffirmed this principle in holding that the confrontation clause bars admission by the State of a witness's out-of-court, testimonial statement, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

We further held in *Tyler* that neither *Nance* nor Md. Rule 5–802.1 applies to prior non-inconsistent statements or to cases where the declarant is not available for cross-examination. In the present case, if Bailey had simply continued to refuse to testify, "despite the bringing to bear upon him of all appropriate judicial pressures," he would have been deemed unavailable for cross-examination despite his presence in court. *Nance*, 331 Md. at 572, 629 A.2d at 645. Bailey's refusal to testify could not have been deemed inconsistent with his prior testimony in which he said it was Archer's idea to rob people that night, that Edmonds gave his gun to Archer after the shooting, and that Archer approached the victim, Lyons. As a result of Bailey's decision to testify in the present case, and to testify inconsistently, the court admitted portions of Bailey's prior recorded testimony. In closing argument to the jury the State emphasized that Bailey gave the police the identity of Archer, the third assailant. The State argued to the jury that,

during [Bailey's] prior testimony, you found out he gave additional information, information that led the police to Anthony Archer. And that once Anthony Archer's identification was determined, you know Lewis Bailey was shown a

photo array and he, in fact, identified Anthony Archer as the third person who was involved in the crime back when he was trying to cooperate.

\* \* \* \*

Well if it hadn't been for Lewis Bailey telling us who this third person was, we would never have found out who the person was who shot Rudolph Lyons in the eye. And that person would have forever been free, running the streets and not been brought to justice for what he did on September 12, 1997. That's why those kinds of deals sometimes have to be made. And that's why Judge Prevas made that offer of life suspend all but fifteen years to Lewis Bailey.

\* \* \* \*

[T]here seems to be some reason that [Bailey] can't admit his full involvement in this crime. But you did hear his prior testimony from the other trial and you heard what he said at the other trial.

Thus, it is clear that the State placed substantial reliance upon Bailey's in-court testimony, as well as his prior statements, in presenting its case against Archer.

### III.

Archer contends in this appeal that Judge Prevas improperly persuaded Bailey to testify and erred in admitting into evidence Bailey's prior recorded testimony. He asserts that the trial judge's comments were an effort to overwhelm and reverse Bailey's decision not to testify. Further, he contends by analogy, primarily in reliance on *State v. Stanley*, 351 Md. 733, 720 A.2d 323 (1998), that the judge went beyond a general warning to the witness about the consequences of perjury and, in effect, encouraged Bailey to commit perjury. Moreover, Archer suggests that it is possible that Bailey testified falsely at the Edmonds trial. Thus, Archer concludes that the trial judge's advisement in this case aided Bailey in committing a second perjury and made it clear to him that he could continue to falsely implicate Archer with impunity.[5]

---

**5.** Because of our conclusion that the trial judge's admonition to the witness was improper and prejudiced Archer's case, we need not

The intermediate appellate court, in its review of the record, found no basis for the conclusion that Judge Prevas coerced Bailey's testimony by threats. That court held that the trial judge did not err in admitting into evidence the prior recorded testimony because Bailey's testimony at Archer's trial was, in part, inconsistent with his testimony at Edmonds's trial. Moreover, the court concluded that even if the trial judge's comments were in error, Archer was not prejudiced because Bailey's testimony tended to incriminate Archer and his testimony resulted in the introduction of Bailey's prior testimony, which further incriminated Archer. In conclusion, the intermediate appellate court held that, "inculpatory evidence was bound to come into play either by Bailey on the stand or through Bailey's prior testimony." Our review of the record and the applicable law, however, mandates a different result.

■ We find that the trial judge's efforts to persuade the witness to testify went too far. If Bailey persisted in his refusal to testify, Judge Prevas had the option of either initiating direct contempt proceedings or constructive contempt proceedings. *See* Md. Rules §§ 15-201 through 15-208. The authority to initiate contempt proceedings, however, is not a license to intimidate a witness into testifying. The purpose of the contempt power is to provide a means for a judge to uphold the dignity and integrity of the judicial process. Under the circumstances of this case, the phone call to another judge in the presence of the witness, the threat of life imprisonment as a sanction for contempt, and the suggestion that the other judge will give Bailey the longest possible penalty for contempt detracted from the dignity and integrity of the judicial process rather than uphold it.

■ Similarly, it was unnecessary and excessive to instruct Bailey on how he could testify in the Archer case.[6] Bailey was

address Archer's contention that the trial judge's advisement assisted Bailey in committing a second perjury.

**6.** In *Davis v. State,* 334 So.2d 823, 826 (Fla.Dist.Ct.App.1976), the District Court of Appeals for Florida held that the prosecuting attorneys

represented by counsel who could have advised him concerning the various testimonial options if that was deemed necessary under the circumstances. Even if Bailey was unrepresented, it was not the province of the court to suggest to the witness how he could testify to avoid a contempt sanction or how to allay his fears of testifying. In either case, it was not the function of the trial judge to suggest to the witness that he could testify favorably to the defendant, Archer. Specifically, Judge Prevas advised Bailey that he could "testify favorably to the defendant" and that "there is nothing anybody can do to punish him for that." That admonition was incorrect, because Bailey could be prosecuted for perjury. *State v. Mercer,* 101 Md. 535, 61 A. 220 (1905); Md.Code (2002), § 9–101 of the Criminal Law Article.

 Furthermore, we disagree with the intermediate appellate court that the trial judge did not coerce Bailey to testify with threats. Threatening comments must rise to the level of "a threat over and above what the record indicate[s] was necessary, and appropriate." *United States v. Jackson,* 935 F.2d 832, 847 (7th Cir.1991) (alterations in the original)

---

improperly coerced a witness to testify for the State. The court explained that, while the prosecutor admonished the witness to tell the truth, "it must have been obvious to the witness that the 'truth' was that which she had testified to at an earlier deposition." By admonishing the witness as indicated, the prosecutor had exerted undue pressure on the witness by attempting to inject certain information and influenced or biased the testimony of the witness. The court reasoned that "one who interviews a witness before trial 'must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses.' " (Internal citations omitted.)

In *Marshall v. State,* 291 Md. 205, 434 A.2d 555 (1981), in the context of a case in which we were concerned with a trial judge's admonition that caused the defendant to testify a certain way, out of fear that if he did not, he would suffer severe, but unexplained consequences, Judge Cole writing for the Court stated: "The need to maintain impartiality ... demands that the court exercise its authority with care, and refrain from questioning which may pressure a witness to testify in a particular way.... In this manner, the judge is most likely to preserve his role as an impartial arbiter, because he avoids the appearance of acting as an advocate.... Most fundamental, a defendant in every case, whether a jury or not, is entitled to an impartial judge."

(quoting *United States v. Simmons,* 670 F.2d 365, 369 (D.C.Cir.1982)). In our view, the entire process: the three warnings of contempt, the phone call to Judge Themelis in the presence of the witness, the threat of life imprisonment as a sanction for contempt, the threat that Judge Themelis will give Bailey the longest possible penalty for contempt, and the advice on how he could testify, was calculated to compel Bailey's testimony.[7] The advisement was, therefore, excessive and improper. Even though the record is silent about what occurred when Bailey appeared before Judge Themelis, and Bailey did not elect to testify until he returned from Judge Themelis's courtroom, those factors do not persuade us that Judge Prevas's conduct had no influence on Bailey's decision to testify and to testify inconsistent with his prior testimony. When asked directly during Archer's trial what occurred in the other judge's courtroom, Bailey testified, "The only thing I heard him say was that if I don't testify, it will be 20 years. I don't know if I would get the 20 years but if the jury found me guilty." We cannot say that Bailey's ultimate decision to

---

7. On the issue of causation, the Court of Special Appeals failed to discuss the likely effect of Judge Prevas's remarks and conduct on Bailey's intended testimony. This omission may have resulted from the intermediate appellate court's determination that the trial judge's comments were a correct recitation of the law and that Judge Themelis's comments caused Bailey to take the stand and testify. The reviewing court, however, should consider the record and determine the probability or possibility of any nexus between the judicial conduct complained about and the witness's testimony or refusal to testify. *See Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330, 333 (1972) (holding that the unnecessarily strong terms used by the trial judge could have exerted such coercion preventing the witness from making a free and voluntary choice whether or not to testify); *Berg v. Morris,* 483 F.Supp. 179, 184 (E.D.Cal.1980) (holding that the witness need not establish that the judicial admonition was either the direct or exclusive factor in the witness's decision not to testify. The test is whether the record "strongly suggests that the judge's comments were the cause") (citing *Webb,* 409 U.S. at 97, 93 S.Ct. at 353, 34 L.Ed.2d at 333); *North Carolina v. Locklear,* 309 N.C. 428, 306 S.E.2d 774, 779 (1983) (holding that it can be fairly inferred from the record that the trial judge's actions invaded the province of the jury and probably caused the witness to change her testimony); *People v. Morley,* 255 Ill.App.3d 589, 194 Ill.Dec. 281, 627 N.E.2d 397, 404 (1994) (holding that the trial court's admonition "could have caused" the witness to refuse to testify).

testify rested solely on the perceived risk of imprisonment for twenty years by the other judge if found guilty of contempt by a jury.

From our review of the record, we are persuaded that Judge Prevas's remarks and conduct likely caused Bailey to change his testimony to reflect the judge's opinion that he could testify "favorably to the defendant" and that "there is nothing anybody can do to punish him for that." The trial judge appeared neutral in expressing his opinion that, "I don't know what's true and not true. . . . He made a plea agreement. He swore under oath that a certain set of facts were true and the mechanism for getting him to repeat those facts at this point, is to sentence him for contempt." Nonetheless, the trial judge's limited and neutral comments must be considered in the context of his excessive efforts to compel Bailey to testify, the tenor of the warnings given, and the likely effect of the court's admonition on the witness's intended testimony. Here, Bailey refused to testify for the State in Archer's prior trial even though he had agreed to testify as part of his plea bargain. After several warnings in the present case, Bailey again refused to testify. Thus, it can fairly be inferred that the judge's conduct and remarks caused Bailey to change his decision not to testify and to testify differently. *See North Carolina v. Locklear*, 309 N.C. 428, 306 S.E.2d 774, 779 (1983) (holding that the trial judge's admonishments to the State's principal witness about lying invaded the province of the jury because it probably caused the witness to change her testimony).[8]

---

8. In *Locklear*, the defendant, Philip James Locklear, was charged with firing a weapon into the home of his former girlfriend, Mary Hunt Campbell. Ms. Campbell was called as a witness in the prosecution's case in chief. During her testimony she was "hesitant and appeared to be trying to help [Locklear]." *Locklear*, 306 S.E.2d at 775. Initially, outside the presence of the jury, the judge admonished the State's witness to ". . . sit up close to the microphone . . . take your hand away from your mouth . . . put your hands in your lap . . . speak up and answer the questions that are asked of you. . . . My observation is that the witness is being a, [sic] recalcitrant and hesitant and [sic] because of that I'm going to allow you to explore this matter in the absence of

In *State v. Stanley,* 351 Md. 733, 720 A.2d 323 (1998), we held that the prosecutor's admonishment prior to trial to a State's witness about the penalties of perjury was nothing more than a general warning and not a coercive attempt to prevent her from testifying even though that witness thereafter exercised her Fifth Amendment privilege against compulsory self-incrimination and did not testify. *Id.* at 748, 720 A.2d at 330. Such a warning, therefore, was not "a threat made to silence or coerce the witness or cause her to produce specific testimony" and did not violate Stanley's right to compulsory process. *Id.* at 749, 720 A.2d at 330.

Further, in *Stanley* we discussed the seminal case of *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). In *Webb,* the United States Supreme Court held that the trial judge's threatening remarks to refrain from lying, directed only at the sole witness for the defense, effectively drove that

---

the Jury at this time. . . ." *Id.* Later the judge instructed the witness to answer the prosecutor's questions and to answer them truthfully. Subsequently, the court interrupted the examination and threatened the witness with contempt and admonished the witness concerning the penalty for perjury. *Id.* at 776. The judge informed the witness that she was not telling the truth and on several occasions directed her to tell the truth. *Id.*

Although Ms. Campbell initially reported to the police that Locklear was parked outside her home at the time of the incident, her in-court testimony was equivocal as to whether or not the person parked outside her home at the time of the crime was Locklear. She testified it was dark and she could not tell who was inside the car, and refused to respond when asked on several occasions what she reported to the police. *Id.* After the last of many warnings by the trial court, "the witness testified that it was [Locklear's] car outside her house and that [Locklear] was the person she saw outside her house at the time she heard the objects strike her home." *Locklear,* 306 S.E.2d at 777. Locklear was subsequently convicted. He appealed and the Court of Appeals found no error and affirmed the trial court. *Id.* at 774.

The Supreme Court of North Carolina granted *certiorari* and answered Locklear's assertion that the trial court denied him due process of law. *Id.* at 775. The court reversed, holding that the trial judge's admonishment to the State's principal witness invaded the province of the jury and probably caused the witness to change her testimony. *Id.* at 779. The court reasoned that "it can be fairly inferred that this testimony resulted from the admonitions of the judge to [the witness]." *Id.* (citing *Webb,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330).

witness off the witness stand, and thus deprived the accused of due process of law under the Fourteenth Amendment. *Webb*, 409 U.S. at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333. The Court emphasized that,

> the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, an that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of the judge to carry out. Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness's mind as to preclude him from making a free and voluntary choice whether or not to testify.

*Webb*, 409 U.S. at 97–98, 93 S.Ct. at 353, 34 L.Ed.2d at 333.

*Stanley*, although factually distinguishable from the present case, is relevant because it reaffirms the proposition that warnings to witnesses about the consequences of perjury must be general and not intimidating or coercive. Likewise, *Webb* is instructive because it illustrates the due process limitations on judicial intimidation of a witness. Although neither *Stanley* nor *Webb* involved a compellable witness's refusal to testify, we find that to be a difference without a distinction. Here there is no question that the witness had no legal right or privilege to refuse to testify. Bailey's only choice was to testify or refuse to testify and face the sanction of contempt. Nonetheless, he had a right to make a free and voluntary choice whether or not to testify. He had the right to choose, free from judicial intimidation and improper advisements, whether to testify or face the consequences of his failure to testify. The difference here is that the trial judge's admonition and conduct was so excessive that it likely caused Bailey to alter testimony in violation of Archer's right to due process.

In addition, in *Webb*, the judge implied that he expected the witness to lie and, in effect, drove the witness from the stand by threatening a conviction of perjury and incarceration. In the present case, the trial judge's remarks and conduct drove the witness to the stand instead of away from it. Again, we find this factual difference between *Webb* and the present case insignificant in light of the court's overall affect on the outcome of the case and the introduction of judicially-induced, altered testimony.

It has often been said that a defendant's due process right to a fair trial, minimally, means a fair and impartial judge. A criminal defendant has a Sixth Amendment right,

> to confront a witness for the prosecution for the purpose of cross-examination or to present his own witnesses to establish a defense. Both rights are fundamental elements of due process of law, and a violation of either could hamper the free presentation of legitimate testimony. . . . If a defendant's attorney is intimidated by a trial judge's unwarranted or unduly harsh attack on a witness or the attorney himself, then the defendant's constitutional right to effective representation guaranteed by the Sixth Amendment is impinged. . . . A . . . final interest of a criminal defendant that may be affected by a trial judge's manner of warning a witness is the defendant's due process right to trial before an impartial tribunal. A fair jury in jury cases and an impartial judge in all cases are prime prerequisites of due process. It is a maxim that [e]very litigant, including the State in criminal cases, is entitled to nothing less than the cold neutrality of an impartial judge. . . .

*North Carolina v. Rhodes*, 290 N.C. 16, 224 S.E.2d 631, 636–38 (1976) (internal citations and quotes omitted).

In *Jackson v. State*, 364 Md. 192, 772 A.2d 273 (2001), we reviewed the appropriateness of a trial court's comments during a judicial hearing. In that case, this Court held that a trial court's comments at sentencing exceeded the outer limits of a judge's broad discretion in sentencing when

the comments could cause a reasonable person to question the judge's impartiality. *Id.* We noted that " '[a] defendant in a criminal case has a right to a fair trial. It is well settled in Maryland that fundamental to a defendant's right to a fair trial is an impartial and disinterested judge.' " *Id.* at 206, 772 A.2d at 281 (quoting *Jefferson–El v. State,* 330 Md. 99, 105, 622 A.2d 737, 740 (1993)). Not only does a defendant have the right to a fair and disinterested judge but he is also entitled to a judge who has "the appearance of being impartial and disinterested." *Jackson,* 364 Md. at 207, 772 A.2d at 281. *See also, Crawford v. State,* 285 Md. 431 at 451–52, 404 A.2d 244 at 254–55 (1979) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.")). Although we were discussing sentencing in the *Jackson* case, we think the standard we enunciated there is applicable. " 'If a judge's comments during [the proceedings] could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion.' " *Jackson,* 364 Md. at 207, 772 A.2d at 281–282 (quoting *Nebraska v. Pattno,* 254 Neb. 733, 579 N.W.2d 503, 509 (1998)).

In *Jackson* we were concerned that the language used by the sentencing judge when sentencing the defendant could lead a reasonable person to draw an inference that race was factored into the sentence imposed. We were most concerned with the sentencing judge's failure to perceive that his comments would lead a reasonable person to conclude that he took into consideration not only the race of the defendant but also the defendant's place of residence and origin. Clearly, none of those factors constitute permissible sentencing criteria. In the present case, no such reasonable inference (the judge's consideration of the defendant's race, residence, or origin) could be drawn. The reasonable inference one could draw from the facts of this case, however, is that it did not matter to the trial judge what facts (true or false) were elicited from

Bailey, so long as he took the stand and testified. Our concern here is the manner in which the judge conveyed that view in the context of Archer's trial.

 We find, under the circumstances of this case, that the trial court strayed from the role of impartiality through its sustained efforts to force Bailey to testify. As a result of the trial judge's remarks to the witness and his conduct, the judge caused Bailey to give testimony inconsistent with his previous testimony and interfered with Archer's right to a fair trial. In an effort to promote fair and impartial judicial proceedings, we affirm and adopt the following guidelines established by the Supreme Courts of Florida and North Carolina, and we recommend that trial judges follow the guidelines when confronted with a reluctant witness:

> When faced with a reluctant witness, the trial judge should avoid comments that resort to "unnecessarily strong terms." Faced with a recalcitrant witness who indicates a concern over testifying because of fear of safety or reprisal, the court could properly advise the witness of the legal consequences of the failure to testify. The trial court could explain that the witness is under subpoena and refusal to testify could subject the witness to being held in contempt of court, which could include the coercive sanction of incarceration. However, such reminders, if given, must be administered in a neutral and objective manner.

 *Muhammad v. Florida*, 782 So.2d 343, 358 (Fla.2001) (internal citations omitted).

> The presiding judge is given large discretionary power as to the conduct of a trial. Generally, in the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial or which involve the proper administration of justice in the court, are within his discretion.... Thus a trial judge may, if the necessity exists because of some statement or action of the witness, excuse the jurors and, *in a judicious manner*, caution the witness to testify truthfully, pointing out to him generally the consequences of perjury....

 *Locklear,* 306 S.E.2d at 778–79 (internal citations omitted).

Whether Judicial or prosecutorial admonitions to defense or prosecution witnesses violate a defendant's right to due process rests ultimately on the facts of each case. Such admonitions should be administered, if at all, judiciously and cautiously.... Witnesses should not be discouraged from testifying freely nor intimidated into altering their testimony....

 *North Carolina v. Melvin,* 326 N.C. 173, 388 S.E.2d 72, 79 (1990).

In all these kinds of cases the reviewing court should examine the circumstances under which a perjury or other similar admonition was made to a witness, the tenor of the warning given, and its likely effect on the witness's intended testimony. If the admonition likely precluded a witness "from making a free and voluntary choice whether or not to testify," or changed the witness's testimony to coincide with the judge's or prosecutor's view of the facts, then a defendant's right to due process may have been violated. On the other hand, a warning to a witness made *judiciously* under the circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have been perjured does not violate a defendant's right to due process. Defendants have no due process or other constitutional right to present perjured testimony.

*Melvin,* 388 S.E.2d at 79–80 (quoting *Webb,* 409 U.S. at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333) (other internal citations omitted).

Even though the judicial statements and conduct calculated to compel Bailey's testimony occurred under circumstances in which the witness had no right or privilege not to testify, we find the judge's overall conduct "unnecessarily strong," "threatening," and prejudicial to the defendant. The tenor of the warnings to Bailey were not judicious in that the warnings were not neutral. The trial judge instructed a colleague to try

and convict the witness of contempt, and the trial judge advised the witness he could testify favorably to the defense, even though his prior testimony was to the contrary. The trial judge's admonitions were aimed at Bailey, an important witness for the State, after that witness expressed a reluctance to testify. The effect of the judge's comments to the witness resulted in the injection of information that improperly influenced the witness's decision to testify, and, ultimately, changed that witness's testimony.

For the foregoing reasons, we hold that Judge Prevas's warnings and conduct directed towards the State's witness were prejudicial to Archer and denied him a fair trial. We base our holding not only on Mr. Archer's constitutional right to due process but also upon our inherent supervisory authority over the administration of justice in Maryland courts. *See United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) (discussing the purposes underlying the use of the supervisory authority of the Court. They are: to implement a remedy for violations of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, as a remedy designed to deter illegal conduct); *State v. Ubaldi,* 190 Conn. 559, 462 A.2d 1001, 1008 (1983) (exercising the appellate court's "inherent supervisory authority over the administration of justice in the trial courts below" to reverse a criminal conviction because of prosecutorial misconduct). Moreover, we conclude that under the circumstances of this case, as a matter of Maryland nonconstitutional criminal procedure, the trial judge's improper use of judicial authority compels that we reverse and remand for a new trial. *See Mitchell v. State,* 320 Md. 756, 769, 580 A.2d 196, 203 (1990) (holding in a summary contempt proceeding, under Maryland nonconstitutional criminal law, in the interest of justice the defendant was entitled to "at least a brief opportunity for allocution before imposing sentence").

In conclusion, because the trial judge's admonitions and conduct contributed to Archer's convictions, we cannot say

that Judge Prevas's errors were harmless. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). In *Dorsey* we said: "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and reversal is mandated." *Id.* Because the trial judge encouraged Bailey to testify and to testify favorably to Archer, Bailey's prior testimony, including his initial identification of Archer as the third assailant, was admitted into evidence. Prior to Bailey's identification, the identity of the third assailant was unknown. Through Bailey's testimony, the State established Archer's identity, that Bailey assisted in Archer's apprehension, and the extent of Archer's complicity in the crimes. Thus, Bailey's testimony constituted both material and crucial substantive evidence of Archer's criminal agency.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT FOR BALTIMORE CITY AND RE-MAND THE CASE TO THE CIRCUIT COURT FOR BAL-TIMORE CITY FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

RAKER, J., and WILNER, J., concur.

HARRELL, J., dissents.

RAKER Judge, concurring, in which WILNER, J., joins:

I concur in the judgment of the Court that reverses the judgment of the Circuit Court. I agree with the majority that the trial judge acted in a wholly inappropriate manner, and I do not believe, on this record, that the error can be regarded as harmless beyond a reasonable doubt. I write separately to

focus upon what I conceive to be the prejudicial error in the case.[1]

I do not believe, as the Court seems to hold, that the harmful error as to Archer consisted in Bailey's being coerced by the trial judge to testify, when he desired not to do so. Bailey was a recalcitrant witness.[2] The State, as well as the defendant, is entitled to have the admissible testimony of competent witnesses, absent just cause. Bailey was a competent and compellable witness who was properly ordered to testify and whose refusal to do so legitimately subjected him to all the penalties allowable for contempt of court. It is not error for a judge to threaten a recalcitrant witness such as Bailey with contempt, or to cause contempt proceedings to be initiated against the witness.

Before a person may be held in contempt, civil or criminal, the person must have fair notice of the court's commands before being punished for failing to comply. Thus, the court has an obligation to make the order of the court clear to the individual. What a judge may not do, however, is to suggest to a witness that, *if the witness testifies in a certain way*, that witness may avoid contempt proceedings. That is error in any situation; a judge should never suggest or propose to a witness how that witness safely may, or ought to, testify.

When a witness is instructed by the judge as to how that witness might testify, the witness's credibility is called into question. Here, possibly because of the trial judge's instruc-

---

1. The majority seems to suggest that Archer would be entitled to a new trial merely because Bailey may have, and probably did, testify because of threats by the trial judge. The cases cited by the majority, *see* footnote 8, are inapposite and do not support that conclusion. In the cases cited, it was the defendant who was *deprived* of the witness's testimony as a result of the trial judge's admonition and thereby prejudiced. In my view, it is the totality of the circumstances presented in the instant case, but primarily the court's instruction as to how the witness should testify, that prejudiced Archer.

2. A recalcitrant witness has been defined as "a witness before any . . . court or grand jury who refuses, without just cause shown, to comply with an order to testify or produce documents or other information." *United States v. Rosa–Ortiz*, 348 F.3d 33, 41, n. 12 (1st Cir.2003).

tions, Bailey testified favorably to Archer in accord with the judge's suggestion. The State was thereby allowed to offer Bailey's prior recorded testimony, which was inconsistent with his present trial testimony and was adverse to Archer. One obvious problem with doing that is that it would be difficult, if not impossible, for a jury ever to know whether the testimony given was indeed what the witness actually knew and believed, or whether it was more the product of judicial inducement or coercion. In some settings, that kind of conduct can come perilously close to suborning perjury.

The State argues, and Judge Harrell believes, that the error was harmless in that the testimony Bailey actually gave from the witness stand was more favorable to Archer than the testimony he was expected by the State to give, and had he testified consistently with his earlier testimony, the jury would have heard the same story. I disagree, for several reasons, the most cogent of which is that, as a result of the change in his story, prompted by the judge, Bailey's previous testimony was admitted as substantive evidence and his more favorable testimony from the witness stand was thereby discredited. What the trial judge thus may have done was to suggest testimony favorable to Archer that the jury, once apprised of Bailey's earlier testimony, likely *would* find incredible and disregard, to Archer's obvious detriment. In these circumstances, there *was* demonstrable prejudice to Archer.

In the case before us, there was not simply a passing suggestion for Bailey to consider, which would have been bad enough. The trial judge offered that suggestion as a way out of an immediate trial for criminal contempt, to be followed by the most severe sentence that the law allows. The specter of the trial judge sitting on the bench, in front of Bailey, arranging with Judge Themelis over the telephone to immediately try, and even before any trial commenced, to convict and sentence Bailey, followed by a suggestion that Bailey could escape that prospect by testifying inconsistently with his previous testimony is something which, due process considerations aside, this Court cannot tolerate.

The conduct of the trial judge was prejudicial error and Archer is entitled to a new trial.

Judge WILNER has authorized me to state that he joins in this concurring opinion.

HARRELL, Judge, dissenting.

Petitioner, Anthony Rodney Archer, was convicted of felony murder, attempted first degree murder, and two counts of the use of a handgun in a crime of violence. We granted certiorari to determine whether Archer should receive a new trial because the trial judge erred when he threatened a reluctant State's witness, Lewis Bailey, with possible contempt and imprisonment, and advised the witness that he, contrary to his prior testimony in a co-defendant's trial and before the Grand Jury that indicted Petitioner, could testify in favor of the Petitioner, thus permitting the State to introduce any earlier inconsistent statements as substantive evidence of Archer's culpability. The Majority and Concurring opinions here hold that Archer's due process rights were offended by one or more aspects of the trial judge's injudicious and excessive comments. Though I agree there was error, the error was harmless on this record. Thus, I respectfully dissent. I would affirm the judgment of the Court of Special Appeals.

## *What About the Other Evidence?*

The testimony of Lewis Bailey, the reluctant witness, was not the only inculpatory evidence presented to the jury at Archer's trial. The State also presented eyewitness testimony from the two surviving victims of the robbery-homicide, Rudolph Lyons and William Faulkner. Lyons was adamant in his identification of Archer as the man with whom he first struggled, and who subsequently shot him in the eye as he lay on the sidewalk:

[Prosecutor:] Now, the person that you said approached you and put the gun in your stomach and tussled with you, that's the same person that stood over you and shot you in the face?

[Lyons:] Yes.

[Prosecutor:] Is that person in the courtroom today?

[Lyons:] Yes.

[Prosecutor:] Where is that person seated?

[Lyons:] Right there. That's the person that shot me in my eye and tried to kill me. He thought he killed me but he didn't. You just took my eye. That's all you did. And you scarred me for life.

[Prosecutor:] Indicating the defendant for the record.

\* \* \*

[Prosecutor:] How many times did you actually see his face?

[Lyons:] When he got up on me and he—when he put the gun in my stomach, I'm looking him right in his eyes. And he grabbed for my chain. That had to take a few seconds. I got the gun away from him and when we got to tussling, I'm still looking at him. And then when I get shot in my shoulder and I fall and turned around, this is the same person standing over the top of me looking me dead in my eye and pulled the trigger.

The apparent certainty of Lyons' identification was unshaken during cross-examination.

The second victim, William Faulkner, also testified that he recognized Archer as one of the three men involved in the robbery-homicide. Although Faulkner saw Archer's face only after he ran across the street once the shooting began, he positively identified Archer at trial. Additionally, two years prior to Archer's trial on 9 December 1999, both Lyons and Faulkner independently picked out Archer in a live police line-up.

*What to Make of the Evidence Adduced Through Bailey?*

A.

I agree that the trial judge in Archer's case, Judge Prevas, made unduly heavy-handed comments to Bailey and his lawyer in an effort to induce Bailey to testify at Archer's trial, as Bailey had promised to do in his earlier plea agreement with

the State. Petitioner contends, and the Majority accepts, that, but for Judge Prevas's comments during Archer's trial, Bailey would have stood firm on his refusal to testify and, therefore, the jury would not have heard Bailey's live testimony, nor excerpts from his videotaped testimony from the co-defendant's trial on 30 August 1999.

I am not convinced, on this record, that Judge Prevas's comments at Archer's trial necessarily were the clear, procuring cause of Bailey's decision to testify.[1] Although inappropriate in context, the judge's threat of life imprisonment for contempt was moderated more than Petitioner would have us believe.[2] More importantly, even after these dire admonitions, Bailey nonetheless refused to testify, choosing instead to take his chances in a contempt trial before Judge Themelis.

There is no credible record of what transpired before Judge Themelis. It is a fact, however, that only after appearing before him did Bailey agree to testify in Archer's trial. When asked directly during Archer's trial what occurred in Judge Themelis's courtroom, Bailey testified, "The only thing I heard him say was that if I don't testify, it will be 20 years. I don't know if I would get the 20 years but *if the jury found me guilty.*" (emphasis added). Bailey's ultimate decision to testify, therefore, was not based necessarily on the prospect of a summary conviction for contempt with a punishment of life imprisonment as supposedly theorized by Judge Prevas, but

---

**1.** The Concurring opinion, at 363, also seems to accept that Bailey's ultimate decision to testify, albeit in a somewhat less unfriendly tone towards Archer than previously set, was "prompted by the judge [Judge Prevas]."

**2.** Contrary to Petitioner's assertion at oral argument before this Court, Judge Prevas did not guarantee that Bailey would be convicted of contempt. Rather, he indicated that a sentence would be imposed upon Bailey only if he were convicted of contempt. Additionally, the judge's statement that Bailey could receive life imprisonment for contempt was couched in theoretical terms. He also indicated that he was somewhat uncertain whether this Court would allow to stand such a punishment, if imposed. As Bailey was represented at the time by experienced and competent counsel, it is less likely that Judge Prevas's remarks alone, as inappropriate, injudicious, and excessive as they were, bullied Bailey into submission.

more likely because he perceived a risk of imprisonment of perhaps up to twenty years from Judge Themelis if he were found guilty of contempt by a jury. For all we know on this record, whatever Judge Themelis said to Bailey could have conformed to the ideals urged by the Majority (*see* Maj. op. at 356–58).

Petitioner further contends that Bailey's testimony also was procured by Judge Prevas effectively granting Bailey a "license to commit perjury." I am not convinced that the inappropriate suggestion to Bailey that he may choose to testify more favorably (or at least "friendlier") to Archer than in his prior testimony was a determinative factor in Bailey's election to testify. Bailey's stated reason for his reluctance to testify stemmed from a jailhouse assault upon him, which he attributed to retribution for his earlier testimony at the co-defendant's trial and inferentially as a warning regarding further testimony about the crimes. Yet, at Archer's trial, Bailey, supposedly freed by Judge Prevas of any fear of a perjury charge, nonetheless provided substantial and relevant inculpating testimony against Archer, stating that Archer joined in the conspiracy to commit robbery; that he armed himself for that purpose; and, that he participated in the attempted robbery and shooting. These elements of his testimony at Archer's trial were consistent with his earlier testimony at Edmonds's trial.

Let us consider for a moment the asserted "inconsistencies" between Bailey's testimony at the co-defendant's prior trial and that given at Archer's trial. First, at the prior trial, when asked by the State how he and the co-defendants reached the decision to commit robbery, Bailey testified, "[Archer] seen some nice chains that he wanted so he told us, we got to go out the way to get some guns to come back down here and get some chains. . . ." But at Archer's trial, when asked whose idea it was to commit the robbery, Bailey testified, "It was Keith [Edmonds] out there." When confronted by the State about this inconsistency, Bailey testified, "We all said that [we should commit robbery], so that ain't nothing." The second "inconsistency" was premised on, at the prior trial, Bailey

testified that Archer approached Lyons at the start of the robbery. At Archer's trial, however, Bailey testified that he didn't see whom Archer approached: "I wasn't paying nobody no mind. I wasn't paying [Archer] no mind." When confronted about the vagueness of this testimony, Bailey said of his prior testimony, "I guess that's who we had. I didn't know who had who for real." When pressed further by the State, Bailey testified, "It was that [the events were fresher in his mind at the prior trial]. But not really though. Because I forget things. You understand, I was going to ... a slow education school." The final "inconsistency" in Bailey's testimony was whether he observed, after the robbery-homicide, Edmonds hand his gun to Archer. At the prior trial, Bailey admitted to seeing the transfer; but at Archer's trial, when asked if observed the transfer of the gun, Bailey testified, "... I ain't see [sic] that. Give the gun? I don't recall." These so-called inconsistencies do not amount to perjurious testimony given under the implied immunity that Petitioner asserts Judge Prevas effectively extended. To the contrary, it is just as likely that Bailey gave testimony to the best of his present recollection, given the lapse of five years since the shooting and the fact that Bailey was a self-described "slow learner" who lacked the reading skills necessary to refresh fully his recollection with the transcript of his testimony at the prior trial.[3]

---

**3.** The so-called inconsistencies between Bailey's testimony at Archer's trial and that given at Edmonds's trial seem relatively insignificant. Which of the alleged criminal Svengali's hatched the original plan to rob, whether Archer approached Lyons early or later in the criminal episode, and whether Edmonds passed his weapon to Lyons *after* the crimes transpired are of minimal or no significance to the elements of the crimes for which Archer was convicted and figure only in the overall credibility assessment assigned to the jury. Other than his important role in identifying to police Archer as the third miscreant, Bailey's trial testimony regarding Archer was either favorable to Archer (in that it was less culpable than before) or, in terms of culpability, cumulative to that of Lyons and Faulkner. If Bailey's reasons for his reluctance to testify had substance, it is ironical in the extreme that Archer shall prevail here, considering the jailhouse intimidation of Bailey, because Judge Prevas assertedly counter-intimidated Bailey into testifying.

In *Brown v. State*, 339 Md. 385, 663 A.2d 583 (1995), a prosecutor's statement was held to be error where, in her closing argument to the jury, she argued that if it found the defendant guilty, it could recommend mercy. *Id.* at 395–96, 663 A.2d at 588–89. The jury found the defendant guilty, but did not recommend mercy. *Id.* at 396, 663 A.2d at 589. The majority in *Brown* could not conclude, beyond a reasonable doubt, that the jury, after considering the prosecutor's remark, had not convicted Brown based on a lesser standard of proof. *Id.* at 397–98, 663 A.2d at 589. Writing in dissent, Judge Rodowsky, joined by Judges Chasanow and Raker, opined that because the verdict was unqualified, the prosecutor's error was harmless. *Id.* at 398, 663 A.2d at 590 (Rodowsky, J., dissenting). Somewhat similarly, the record in the present case does not compel the conclusion that Bailey relied on the comments of Judge Prevas in Archer's case to reach his decision to testify. As did the Majority in *Brown*, the Majority here engages in "an interesting, but irrelevant, discussion of a problem in the abstract." *Id.* at 398, 663 A.2d at 590.

### B.

Even if Bailey's testimony in Archer's trial was procured solely or was caused proximately by Judge Prevas's comments, the errors committed by Judge Prevas were harmless.

---

The Concurring opinion, concerned about the potential harm to Archer's ability to receive a fair trial in the face of the testimonial inconsistencies, frets "that it would be difficult, if not impossible, for a jury ever to know whether the testimony given was indeed what the witness knew or believed, or whether it was more the product of judicial inducement or coercion." Concurring op. at 363. Notwithstanding my explained view as to the relative triviality of these inconsistencies, I also conclude that resolution of what parts of Bailey's testimony (current and former) to believe and what parts to discredit was a routine function that this jury was not hampered in doing, or confused about, on this record. The Concurring opinion assumes that the jury in fact "discredited" or "likely *would* find incredible and disregard Bailey's testimony favorable to Archer." *Id.* at 363 (emphasis added). I make no such unwarranted assumption because there were lots of reasons, other than the mere inconsistencies, for the factfinder to believe or discredit any portion or all of the evidence attributable to Bailey. *See* Fn. 4 *infra*.

When a reviewing court finds trial error, the appellate court must reverse the judgment below unless it concludes the error was harmless. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). In making that determination, the reviewing court conducts an independent review of the record with the end of determining whether it is satisfied beyond a reasonable doubt that the error in no way influenced the verdict. *Id.* In other words, there must be "no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded." *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680, 687 (1976). In the present case, a reasonable fact-finder could have found Archer guilty, absent Bailey's testimony, because there was overwhelming other evidence supporting the convictions.

The oft-repeated test for sufficiency is whether, "after viewing the evidence in the light most favorable the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). In the present case, Lyons provided strong and unshaken eyewitness testimony that he got several good looks at Archer's face during the robbery-homicide. Lyons positively identified Archer as the man who shot him on the night of 11 September 1997. In addition to Lyons's testimony, the jury also heard from a second eyewitness, Faulkner. Faulkner testified that he too recognized Archer's face from the robbery-homicide, albeit he saw Archer's face only when running from the scene; thus, his testimony may have commanded somewhat less persuasive force than that of Lyons. In considering the sufficiency of evidence, however, it is not the role of the appellate court to re-weigh evidence or determine the credibility of a witness. *See, e.g., Jones v. State*, 343 Md. 448, 465, 682 A.2d 248, 257 (1996) (citing *State v. Raines*, 326 Md. 582, 590, 606 A.2d 265, 268 (1992); *Wilson v. State*, 319 Md. 530 at 535, 573 A.2d 831, 833–34 (1990)). Rather, due regard must be given to the jury's findings of fact and its opportunity to observe and assess the credibility of

witnesses. *See, e.g., White v. State,* 363 Md. 150, 162, 767 A.2d
855, 861 (2001) (and cases cited therein). Although Faulkner's
testimony was not as unequivocal as that of Lyons, his testi-
mony provided a second positive identification of Archer. The
record before us shows Lyons's and Faulkner's testimony was
uncontradicted, and therefore, under the *Jackson* analysis, we
must assume was believed by the jury. Thus, the jury had
before it on which to base its verdict the testimony of two
eyewitnesses who saw Archer attempt to rob them at gunpoint
and shoot Lyons in the eye. Furthermore, both Lyons and
Faulkner independently identified Archer in a live police line-
up two years prior to the trial.[4]

---

**4.** Archer raises no appellate issue before this Court that Bailey's identi-
fication of him to police tainted the line-up. Moreover, the jury was
aware that Bailey's testimony at Archer's trial, watered-down or other-
wise, was subject to a plea agreement regarding his role as a confeder-
ate of Archer's in the crimes. Judge Prevas, in his final instructions to
the jury, gave the following specific direction as to Bailey's testimony:

You've heard testimony from Lewis Bailey who was an accomplice.
An accomplice is one who knowingly and voluntarily cooperated
with, aided, advised or encouraged another person in the commission
of a crime. You must first decide whether the testimony of Lewis
Bailey was corroborated before you may consider it. The defendant
cannot be convicted solely on the uncorroborated testimony of an
accomplice. However, only slight corroboration is required. This
means there must be some evidence in addition to the testimony of
Lewis Bailey tending to show, either one, defendant committed the
crime charged.

Or, two, the defendant was with others who committed the crime at
the time and place the crime was committed.

If you find the testimony of Lewis Bailey has been corroborated, it
should be considered with caution and given such weight as you
believe it deserves.

If you find the testimony of Lewis Bailey has not been corroborat-
ed, you must disregard it and may not consider it as evidence against
the defendant. Remember, the defendant cannot be convicted solely
on uncorroborated testimony of an accomplice.

You also heard testimony that Mr. Bailey has pleaded guilty to a
crime arising out of the same events for which the defendant is now
on trial. The guilty plea of this witness must not be considered as
evidence of guilt against the defendant. You may consider the guilt
of the witness in deciding whether the witness is telling the truth, but
for no other purpose.

You may consider the testimony of a witness who testifies or has
provided evidence for the state as a result of a plea agreement, or a
promise that he will not be prosecuted, or a financial benefit, or a

It is the well-established rule in Maryland that the testimony of a single eyewitness, if believed, is sufficient evidence to support a conviction. *See Branch v. State,* 305 Md. 177, 502 A.2d 496 (1986); *Walters v. State,* 242 Md. 235, 237–38, 218 A.2d 678, 680 (1966) (stating, "identification by the victim is ample evidence to sustain a conviction."). This Court has held that even when a witness cannot identify the defendant at trial, evidence of the witness's previous identification of the defendant in a line up is sufficient to sustain a verdict. *See, e.g., Nance v. State,* 331 Md. 549, 560–61, 629 A.2d 633, 639 (1993); *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982). With the overwhelming evidence provided by Lyons and Faulkner alone, looked at in a light most favorable to the prosecution, a rational trier of fact could have found Archer guilty beyond a reasonable doubt. Judge Prevas's errors, therefore, were harmless. The judgment of the Court of Special Appeals should be affirmed.

---

benefit. However, you should consider such testimony with caution because the testimony may have been influenced by a desire to gain leniency or freedom or financial benefits or a benefit by testifying against the defendant.