896 A.2d 1023

**McKim McKenney SIMMONS**

**v.**

**STATE of Maryland.**

**No. 57, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 17, 2006.

Claudia A. Cortese, Asst. Public Defender (Nancy S. For-
ster, Public Defender, Baltimore), on brief, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Baltimore), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

In this case, we must determine whether the trial court committed reversible error by refusing to permit appellant during cross-examination of the State's medical expert to ask the expert whether his medical opinions concerning the victim's injuries would change if he knew that appellant's wife had written a letter indicating her intent to assert her Fifth Amendment privilege against self-incrimination if called to testify in the case. We shall hold that the trial court acted within its discretion in prohibiting this proposed line of cross-examination, and affirm the judgment of the trial court.

## I.

Appellant McKim McKenney Simmons was indicted by the Grand Jury for the Circuit Court for Howard County for the offenses of physical child abuse, second degree assault, and reckless endangerment. He proceeded to trial before a jury and was convicted on all counts. He was sentenced to a term of incarceration of ten years, four suspended, for the child abuse conviction, and a concurrent three year sentence for reckless endangerment. The assault conviction was merged for sentencing purposes.

Around 7:10 a.m. on March 18, 2003, paramedics arrived at appellant's apartment in response to a 911 call. The paramedics were let in by appellant, who told them that his daughter Nyah had fallen off a bed. Appellant then led the paramedics to the bedroom, where they found Nyah lying on the bed. Paramedics found her to be unresponsive, with a weak pulse and shallow respiration. They transported her to Howard County General Hospital, accompanied in the ambulance by appellant.

Upon arrival at Howard County General, Nyah was examined by Dr. Nizhut Hando. Dr. Hando observed Nyah to be apneic, unresponsive, and breathing very shallowly. He believed she was suffering from intracraneal bleeding, but did not perform a CAT scan to confirm this because he believed Nyah was not stable enough to undergo the scan. Dr. Hando regarded Nyah's condition as "very critical," and arranged to have her transported to Johns Hopkins Hospital. Another physician at Howard County General, Dr. Jackson Tsai, treated Nyah before she was transported to Johns Hopkins. Finding her vital signs unstable, he established an airway for her to breathe through, and gave her IV fluids, medications, and chest compressions in an effort to raise her heart rate.

Nyah was transported to Johns Hopkins, where she was diagnosed with right frontal epidural hematoma, a left frontal subarachnoid epidural hemorrhage, right parietal subdural hematoma, right parietal bone fracture, and interhemispheric subdural hematomas. An ophthalmologist examined Nyah and determined that she had retinal hemorrhages and macular folds in both eyes.

Appellant related the following version of the events of March 18th in a statement to the police. Nyah fell asleep around 10 p.m. the night before. She slept on the floor because she had fallen out of bed before. Appellant awoke around 5:15 a.m. and helped his wife, Patricia Dockery, get ready for work. Dockery left around 6:20 a.m. Nyah awoke some time after Dockery left. Appellant noticed that Nyah had what appeared to him to be vomit on her shoulder, so he decided to give her a bath. He laid Nyah on the bed, and left the room to get a plastic bathtub. On his way back with the tub, appellant heard Nyah scream. He then dropped the tub, ran into the bedroom, and discovered Nyah on the floor, noticing that she had a scratch on her face. Appellant placed Nyah on the bed, and called his wife, Dockery, around 7:03. When Dockery did not answer, he left a message. She did not call back, and appellant called her again around 7:10, reaching her this time. Dockery told him to call 911, which he did.

After the police learned that Nyah's doctors believed that her injuries were nonaccidental, they re-questioned appellant on several occasions concerning the events of the 18th, specifically confronting him with the diagnoses of the physicians and their belief that Nyah's injuries were likely caused by nonaccidental trauma. Appellant consistently adhered to the version of events he initially told police, expressly denying that he shook Nyah.

Prior to trial, the State made an oral motion *in limine* to preclude the defense from mentioning in opening statement the possibility that Dockery would assert her Fifth Amendment privilege against self-incrimination. The State relied upon *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002), and argued that whether Dockery could assert her privilege before the jury needed to be first decided by the trial court, outside the presence of the jury. Defense counsel indicated to the court that he had no intention of mentioning in opening "the fact that my client's wife has now invoked her Fifth Amendment privilege against self-incrimination." Defense counsel expounded on his theory as to the admissibility of the evidence as follows:

"My guess is, how the evidence is going to come out, that a missing witness instruction will not lie with respect to that [inaudible] ... She's not uniquely available to the State. Whether her assertion is capricious or real, I don't think I'll ultimately get that instruction. However, the State's relying on experts in this case—there were four people with this victim in the last twenty-four hours before her injury. If the State's expert is relying on any information from Ms. Dockery ... As a matter of fact, if the State's expert is relying on past O.B./G.Y.N. records, pediatrician's records, whatever factors go into their determination for the timing of this injury, the cause of this injury, clearly Ms. Dockery's assertion of her Fifth Amendment privilege goes to the heart of the matter that they must consider. And if that expert has not considered it, this jury must know how that would change his or her opinion. I'll ask permission from the Court before I would confront one of the State's wit-

nesses; however, if Ms. Dockery violently shook this baby and this expert does not know that, this jury must. And I understand what the State is saying, and I have no issue—I was not going to utilize the two letters have, or actually, the one; I guess one was sent to the State, one was sent to me—wherein . . . And again, I can mark it or introduce it for the Court's consideration she asserts her Fifth Amendment. I just believe that is a factor in any experts' determination of who caused this injury, when the injury was caused. . . ."

Defense counsel agreed not to mention anything during opening statement about Dockery's intention to assert the privilege and the court reserved ruling on the issue, with the specific assurance from defense counsel that the issue "will only come up during the expert's testimony, if at all."

At trial, the State called Dr. Allen Walker, a physician at Johns Hopkins. On direct examination, Dr. Walker began by explaining the nature of Nyah's injuries and the treatment she received for them. He then testified as to his discussions with appellant and Dockery during the course of treating Nyah:

"Q: [D]id you have occasion to meet at any time with Nyah Simmons' parents?

A: I did.

Q: Now, can you tell us when you met with Nyah Simmons' parents?

A: I met with the parents on March 20th at about 4 o'clock in the afternoon.

*      *      *      *      *      *

Q: Now, can you describe what the purpose of the meeting on March 20th at 4:00 p.m. was?

A: Yeah, several purposes. The first was simply to sit down and take what we call a history. Trying to understand Nyah as a child, and also understanding what lead to—to her condition. Also to review with the parents what was going on. Because the pediatric intensive care unit or the PICU can be a very confusing place. There are lots of doctors involved. And so we try to make sure that parents

understand what's happening. And in particular what our thought processes are, what our opinions are, and what they might expect, at least from the point of view of the investigations to come, so that they at least don't have a lot of surprises in store for them.

Q: Now, did you have occasion during the course of the examination in preparation for your meeting to look at the history that had been provided from the parents?

A: Actually, we took—yes, and then we took the history directly from the parents as well."

Dr. Walker then offered his opinion as to the cause of Nyah's injuries, testifying as follows:

"Q: Dr. Walker, did you have occasion, after you reviewed the records and the examination, when you were meeting with the parents, and I guess at this point, I would say at this point, have you had an opportunity to form an opinion as to what caused injuries to Nyah Simmons?

A: Yes. You know, after review of the CT scans and x-rays and the findings of the ophthalmologist and some of our lab tests, yes.

Q: And to a degree of medical certainty, Dr. Walker, can you tell us what is your opinion as to the cause of Nyah Simmons' injuries that exhibited themselves on March 18th?

A: To a reasonable degree of medical certainty, the findings are diagnostic of—of abusive head trauma by shaking. And because of fracture, there was at least one impact. But these are really diagnostic of—of physical child abuse in the form of shaking, and at least one impact."

Dr. Walker explained that his opinion was based on the fact that the injuries suffered by Nyah are caused almost exclusively by shaking, and that Nyah's injuries were too severe to have been caused by falling off a bed. Dr. Walker then testified as to the manifestation of Nyah's injuries:

"Q: Can you tell us, Dr. Walker, a bit about when a child with the extent of Nyah's injuries would exhibit symptoms of these injuries, sir?

A: With the extent of these injuries—with the extent with injuries to this extent, we would expect symptoms immediately or certainly within seconds.

Q: And what type of symptoms would you expect based on the injuries that were inflicted upon Nyah?

A: Typically, first, a change in consciousness, a what we call a stupor where somebody doesn't quite know where they are or what's going on, and then very quickly a loss of consciousness, and then ultimately a loss of the reflexes that kind of keep the heart going, and keep breathing going, and that sort of thing.

Q: Now, how long would a child be able to survive without medical intervention with these types of injuries, Dr. Walker?

A: Minutes."

On cross-examination, defense counsel asked whether Dr. Walker had reviewed Dockery's prenatal records in forming his opinion as to the cause of her injuries, and attempted to determine the extent to which Dr. Walker was aware of pretrial statements made by appellant and Dockery. He then asked Dr. Walker whether Nyah's symptoms could have manifested themselves after a longer interval than he had previously indicated in his direct testimony:

"Q: What are occult injuries, if you know that term?

A: Occult injuries would be injuries that aren't immediately obvious on examination.

Q: And are there occurrences in a shaken baby case or child abuse cases where there are lucid intervals for children or young children after trauma?

A: That's currently a matter of investigation.

Q: In the academic literature have you seen anything regarding lucid intervals after injury?

A: Some people do describe them, yes.

Q: Have you ever personally seen that after head trauma?

A: After minimal head trauma, yes. After major head injury, no.

Q: CPR can cause venous pressure and also cause retinal damage, or retinal hemorrhaging, correct?

A: That's not been demonstrated, no.

Q: In the academic literature, have you read anything about retinal hemorrhages coming or increasing from CPR use?

A: I've read fairly extensively in the literature about that question, and to my—and in my opinion there is no evidence that supports the occurrence of retinal hemorrhages as a result of CPR."

Defense counsel then inquired as to the basis of Dr. Walker's medical opinions:

"Q: The prosecutor ... asked you if you looked at the whole injury when forming an opinion, and you indicated, you know, pregnancy, the vaccine, yes, you do look at everything; is that correct?

A: We consider everything.

Q: And the mother and father's communications to you are factors in your determination of what happened?

A: That's correct."

Prior to Dr. Walker's testimony, the court, out of the presence of the jury, again considered whether appellant could ask Dr. Walker on cross-examination if his opinion as to the timing of the incident that caused Nyah's injuries would change if he knew that Dockery had written letters to the parties' lawyers stating that she refused to testify in the case on Fifth Amendment grounds. Dockery's letter to the State's Attorney read as follows:

"This letter is concerning the case of Maryland vs. Simmons. I am the spouse of Mr. Simmons and effective immediately choose to assert my 5th Amendment rights and not testify for or against my husband in the afore mentioned case. From this point forward, I will not discuss any details of the alleged events that took place on March 18, 2003."

Her letter to defense counsel was similar.

Patricia Dockery was never called to testify at the trial. Defense counsel made clear to the court that he had no

intention of calling Dockery to the stand to have her invoke her Fifth Amendment privilege in the presence of the jury. Defense counsel proffered Dockery's letters to show that he had a good faith basis for his proposed line of cross-examination.

Defense counsel requested leave of the court to ask Dr. Walker "in forming [his] opinion for this jury as the fact finder, one of the factors is, did someone else do it. And if they don't know that someone else has invoked the Fifth, I think I have the right to ask them that." In addition, he told the court that he believed he was entitled to pursue this line of questioning because he believed that the expert intended to rely at least in part on Dockery's statements in order to offer an opinion on the timing of the injuries, and that consequently the expert's opinion as to the timing of the injuries may change if he were to draw a negative inference about the veracity of her prior statements given her intention to assert her Fifth Amendment privilege if called to testify.

> The State opposed the request, making the following points: "The doctor can't testify who he thinks did this. Basically he's just going to come in, summarize the injuries, and say this is [what] happened to this child. This is the cause of these injuries. *He does not point a finger as to one person or the other.* That would be impermissible.... Number two, for a Fifth Amendment issue to be asserted, the person has to come into Court and do it. And obviously the State's not going to call her to do that and I think if the defense, in presenting the defense that somebody else did it, wants to do that, they have to call her to have her invoke on the record."

(Emphasis added). The prosecutor explained to the court her reasons for offering Dr. Walker's testimony:

> "The State is offering [Dr. Walker] for explaining the nature of the injuries which have been stipulated to which were suffered by this child explaining the mechanism of injury to this child.... He will testify that once these injuries have been inflicted upon a child, the extent of these injuries is

such that the symptoms that would have been seen by a person would have been almost automatic. . . . I will tell you we didn't send Dr. Walker all of the police reports and discovery materials because we were focusing on the child's injuries, the nature of the injuries, the mechanism of injuries and the timing of those injuries. And that is what he is being called on."

The trial court agreed with the State that it was improper to ask Dr. Walker's opinion as to who actually caused the injury.

The court ruled that defense counsel could not ask Dr. Walker on cross-examination whether his opinion as to the timing of Nyah's injuries would be altered if he learned that Dockery intended to assert her Fifth Amendment rights at trial if called to testify. The court based its ruling on its conclusion that appellant's cross-examination of Dr. Walker on the issue of the timing of the injuries would not be aided by the proposed line of questioning:

"[THE COURT]: I don't see any problem, I mean I certainly don't see any problem and certainly it would be appropriate for you to cross-examine as to if the testimony's going to be that these symptoms would have occurred immediately for you to challenge that and to question whether or not the injuries could have occurred at an earlier time. I mean the jury already has the information that the mother was there until 6:30 that morning. I just, you know, the whole Fifth Amendment issue, I'm just not sure how—why that would make a difference with the physician.

"[Defense counsel]: I think it makes—I think it would be a factor for the physician in telling this jury his opinion.

"[THE COURT]: I don't know. I think you can still cross-examine. I don't think it [is] appropriate. I think that it could be interpreted that this is being offered for some other reason to get this before the jury. And I don't think that that's appropriate. I think you can certainly challenge as to the timing without getting into the fact that she's asserted her Fifth Amendment right against self-incrimination."

Appellant noted a timely appeal to the Court of Special Appeals, and we issued a writ of certiorari on our own initiative prior to consideration by the intermediate appellate court. 388 Md. 404, 879 A.2d 1086 (2005).

## II.

Appellant's defense at trial was that the injury sustained by Nyah was caused by his wife, Patricia Dockery. He argues on appeal that "the trial court erred in refusing to allow the defense to place before the jury the fact that Ms. Dockery asserted her Fifth Amendment privilege against self-incrimination in this matter and further erred in preventing the defense to use this evidentiary fact as a basis on which to question the medical findings of the State's expert witness." Relying on our holding in *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002), that a criminal defendant can, under some circumstances, offer into evidence a witness' assertion of his or her Fifth Amendment privilege, appellant argues that the trial court's refusal to permit his proposed line of cross-examination of Dr. Walker was erroneous.[1]

---

1. The "Questions Presented" section of appellant's brief contained a single question for our consideration on appeal:

   "Did the trial court err in not admitting into evidence the fact that appellant's wife exerted her Fifth Amendment privilege against self-incrimination as a reason for her not testifying in this case?"

   Appellant's argument section raises the additional issue of whether the trial court erred in prohibiting appellant's proposed cross-examination of Dr. Walker. If this case were before us pursuant to a grant of a writ of certiorari subsequent to decision in the Court of Special Appeals, we would ordinarily restrict ourselves to consideration of the questions presented in the certiorari petition. *See* Md. Rule 8–131(b)(1); *Wynn v. State*, 351 Md. 307, 322–23, 718 A.2d 588, 595–96 (1998). In this case, however, because we granted certiorari prior to decision in the Court of Special Appeals, we must "consider those issues that would have been cognizable by the Court of Special Appeals." Md. Rule 8–131(b)(2).

   In *Langworthy v. State*, 284 Md. 588, 399 A.2d 578 (1979), we held that an appellant failed to adequately raise an issue in the Court of Special Appeals when the issue was neither raised in the questions presented nor in the argument section of his brief. *See id.* at 595–96, 399 A.2d at 582–83 (citing predecessors of Md. Rule 8–504(a)(3), requiring statement of questions presented in party's brief, and Md. Rule 8–504(a)(5), requiring "[a]rgument in support of the party's posi-

Appellee's reply is twofold. First, appellee contends that *Gray* is inapposite to the issue before the Court. Appellee argues that *Gray* applies only when a defendant seeks to have a witness take the stand at trial and assert the Fifth Amendment privilege; appellant did not seek to do so and told the court he had no intention of calling Dockery as a witness. Second, appellee maintains that the trial court acted within its discretion to control cross-examination when it ruled that appellant could not pursue his proposed cross-examination of Dr. Walker.

## III.

Appellant's first argument before this Court rests entirely on *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002). Although at first glance this case may seem to present an issue concerning the scope of our holding in *Gray*, upon examination it becomes clear that it does not, as *Gray* is inapposite to the facts before us. Appellant's theory is apparently two-pronged: first, in an effort to show that someone else other than the defendant shook the baby, the trial court erred in not permitting the defense to place before the jury the fact that Dockery asserted her Fifth Amendment privilege against self-incrimination, and second, that the court erred in preventing the defense from using Dockery's assertion of the privilege to question Dr. Walker's testimony as to the timing of the shaking of the baby.

---

tion" in party's brief). We have not, however, held that a party fails to adequately raise an issue before the Court of Special Appeals when the party fails to separately state the issue in the questions presented section of its brief, but raises the issue in the argument section of its opening brief. Consequently, we shall consider the issue of whether the trial court erred in limiting the scope of appellant's cross-examination of Dr. Walker, despite the fact that appellant's only question presented does not raise this issue.

Appellant also argues that the trial court erred by refusing to follow *Gray* and admit Dockery's letters into evidence. Although the letters were marked as defense exhibits, appellant did not attempt to offer them into evidence after the trial court ruled that he could not cross-examine Dr. Walker about Dockery's purported assertion of her privilege against self-incrimination.

■ Appellant's argument that the trial court erred in refusing to allow the defense to place before the jury the fact that Dockery asserted her Fifth Amendment privilege against self-incrimination is not properly before this Court because he never attempted to have Dockery assert her Fifth Amendment privilege before the jury. As a result, the issue is not before us because it was not raised in or decided by the trial court. *See* Md. Rule 8–131(a); *Walker v. State,* 338 Md. 253, 262, 658 A.2d 239, 243 (1995).

On the merits, appellant's argument fails for several reasons. His first argument is meritless because this case does not fall within the reasoning of *Gray.* His second argument is specious as well, because Dockery's so-called assertion of the privilege has nothing to do with Dr. Walker's medical opinion as to the timing of the injury to the baby. In addition, Dockery never exerted her Fifth Amendment privilege against self-incrimination. She only expressed an *intention* to do so in letters mailed sometime before the trial, notwithstanding the trial court's characterization of these letters as a *bona fide* assertion of the privilege.

## A. The Applicability of *Gray v. State*

In *Gray,* we considered the question of whether a trial court had discretion to determine whether a witness should be allowed to invoke the Fifth Amendment privilege in the presence of the jury. *Gray,* 368 Md. at 532–33, 796 A.2d at 699. In that case, we considered a limited exception to the general rule in criminal cases that a witness may not invoke the Fifth Amendment before the jury. We held that under certain circumstances, a defendant in a criminal case may call a witness at trial before the jury to invoke the privilege against self-incrimination. *Id.* at 564, 796 A.2d at 717. We stated as follows:

"We believe that a trial court has some discretion to consider permitting a defendant in a criminal case to call a witness to the stand to invoke his Fifth Amendment privilege in the presence of the jury *if* the trial court first determines whether sufficient evidence has been presented, believable

by any trier of fact, of the possible guilt of the witness the defendant wants to cause to invoke his Fifth Amendment privilege before the jury. The court, in the exercise of that discretion, must consider, as well, the prejudice to the defense of not allowing the potentially exculpatory witness to invoke his Fifth Amendment privilege in the presence of the jury. In opining that such discretion exists, we note that such testimony, if permitted, might be subject to the same restraints that a trial judge normally may exercise as to relevancy, repetitiveness, and the like."

*Id.* at 558–59, 796 A.2d at 714 (emphasis added). Judge Cathell, writing for the Court, set out a general procedure to be followed:

"When a defendant proffers a defense that the crime was committed by another person and the defendant wants to call as a witness that person only to invoke his Fifth Amendment privilege against self-incrimination on the witness stand in the presence of the jury, the trial court, on the record, should make a determination of whether sufficient other evidence has been proffered that, if believed by any trier of fact, might link the accused witness to the commission of the crime. If the trial court finds that such sufficient evidence, linking the accused witness to the crime and believable by any trier of fact, exists that could possibly cause any trier of fact to infer that the witness might have committed the crime for which the defendant is being tried, then the trial court has the discretion to permit, and limit as normally may be appropriate, the defendant to question the witness, generally, about his involvement in the offense and have him invoke his Fifth Amendment right in the jury's presence."

*Id.* at 564, 796 A.2d at 717.

Appellant's reliance upon *Gray* is misplaced. Defense counsel made clear to the trial court, over and over again, that he had no intention of calling Dockery as a witness. He never asked the court for permission to question Dockery about her alleged involvement in the offense and to have her invoke her

Fifth Amendment privilege before the jury.[2] There is simply no error and no *Gray* violation.

### B. The Cross–Examination of Dr. Walker

■ The only proper question before this Court on appeal is whether the trial court abused its discretion in preventing the defense from questioning Dr. Walker as to his knowledge of Dockery's purported assertion of her Fifth Amendment privilege as expressed in her letters and whether his knowledge of Dockery's purported assertion of the privilege would affect his opinions as to the nature and timing of Nyah's injuries.

■ Managing the scope of cross-examination is a matter that falls within the sound discretion of the trial court. *See, e.g., Marshall v. State*, 346 Md. 186, 193, 695 A.2d 184, 187 (1997). A trial court does not abuse that discretion when it excludes cross-examination that is irrelevant. *See* Md. Rule 5–402 (irrelevant evidence is inadmissible). Evidence is relevant if it has "any tendency to make the existence of any fact

---

**2.** Because we reversed Gray's conviction on other grounds, we did not opine on the proper procedure to be followed when a defendant desires to present a witness whom the defendant asserts is the perpetrator of the crime for which the defendant is charged, and that witness desires to exercise the right to remain silent. *Id.* at 558, 796 A.2d at 714. Judge Wilner, in his concurring opinion, joined by Judges Raker and Harrell, discussed the trial court's exercise of the discretion to admit such testimony. His suggestion as to the best course of action for the trial court bears repeating:

> "In many instances, perhaps in most, the best course of action would be to have the witness invoke the privilege and make clear his or her unwillingness to testify, outside the presence of the jury, and for the court then to inform the jury that (1) the witness was called to testify, (2) the witness invoked his or her right not to answer questions, (3) the witness may not be compelled to give testimony that might be self-incriminating, and (4) it is for that reason that the jury will not be hearing from the witness. Except in those situations where it is particularly important for the witness to be called to the stand before the jury—where, for example, the witness is willing to testify to some matters but not to others—this procedure not only informs the jury of the true state of affairs but gives the defendant the full prospect of the desired inference without the danger of unfair prejudice either to the witness or to the State."

*Id.* at 583, 796 A.2d at 729.

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401.

■■■ The Fifth Amendment states in part that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This prohibition permits a person to refuse to answer official questions at any proceeding where his answers might incriminate him in future criminal proceedings. *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409 (1984). To invoke the privilege, the witness need not be guilty of a crime. The privilege extends not only to answers that would in themselves support a criminal conviction but also includes those answers that would furnish a link in the chain of evidence needed to prosecute the person for a crime. The constitutional protection is confined, however, to those circumstances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States,* 244 U.S. 362, 364–65, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917). Significantly, it is not for the witness or counsel to determine whether a witness can properly assert the privilege against self-incrimination; the witness's merely saying that he or she would be incriminated does not excuse the witness from answering the questions. It is the duty of the trial judge to determine whether the witness can properly assert the privilege against self-incrimination and whether the witness's silence is justified. *See Rogers v. United States,* 340 U.S. 367, 374, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *Bhagwat v. State,* 338 Md. 263, 272, 658 A.2d 244, 248 (1995). To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. *See Bhagwat,* 338 Md. at 272–73, 658 A.2d at 248. "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' " *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed.

1118 (1951) (quoting *Ex Parte Irvine,* 74 F. 954, 960 (C.C.S.D.Ohio 1896) (Taft, J.)); *see also State v. Williams,* 200 Conn. 310, 511 A.2d 1000, 1004 (1986) (quoting *Ex Parte Irvine,* 74 F. at 960). In *Bhagwat,* we reiterated the test for the witness's entitlement to invoke the Fifth Amendment privilege as follows:

> "The test of the witness's entitlement to invoke the privilege against self-incrimination—(1) whether there is a reasonable basis for the invocation of the privilege; and (2) whether the privilege is invoked in good faith, was well stated in *Choi v. State,* 316 Md. 529, 560 A.2d 1108 (1989). It is whether 'the witness has reasonable cause to apprehend danger from a direct answer,' and whether it is 'evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' "

*Bhagwat,* 338 Md. at 272–73, 658 A.2d at 248 (internal citations omitted).

Applying these well-settled principles, it is clear that Dockery's letters do not amount to a *bona fide* assertion of her Fifth Amendment privilege against self-incrimination. Dockery was never actually called as a witness at trial. Consequently, no questions regarding the events surrounding Nyah's injuries were ever posed to her in an official proceeding, and there was no determination by the trial court that she had reasonable cause to apprehend a danger of self-incrimination by answering such questions. Thus, Dockery did not assert her privilege against self-incrimination, as she was never placed into a position in which the privilege would potentially be assertable. Therefore, her letters are, at best, a statement of her intention to assert her privilege against self-incrimination if called to testify at appellant's trial, not a genuine assertion of the privilege.

Despite the fact that Dockery's intention to assert her Fifth Amendment privilege against self-incrimination does not satisfy legal requirements to invoke the privilege, the trial judge

seemed to treat them as such. Accordingly, we will consider the correctness *vel non* of the trial judge's ruling. As explained *infra*, the trial judge's exclusion of the proposed cross-examination based upon the letters on grounds that the letters were not relevant to challenging the bases of his opinions was proper. Appellant attempted to question Dr. Walker regarding Dockery's intention to assert her privilege against self-incrimination purportedly for two purposes: (1) to challenge the basis of Dr. Walker's opinions concerning the causes of Nyah's injuries; and (2) to challenge the basis of Dr. Walker's opinions concerning the timing of the manifestation of Nyah's symptoms. Dockery's intention to assert her Fifth Amendment privilege is simply not relevant to Dr. Walker's bases for these opinions. Consequently, the trial judge did not abuse her discretion by preventing appellant from cross-examining Dr. Walker regarding Dockery's intention to assert the privilege.

As appellant's attorney made clear, his actual purpose for his proposed line of cross-examination of Dr. Walker was to challenge Dr. Walker's opinion concerning who caused Nyah's injuries. Appellant's attorney presupposed that Dr. Walker had formed such an opinion, and that this opinion provided a basis for the opinions he had concerning the nature and causes of Nyah's injuries. As he explained to the court, he believed that Dr. Walker, "in forming [his] opinion for this jury . . . one of the factors is, did someone else do it," and that, for this reason, he was entitled to ask Dr. Walker whether his opinions about the nature, causes, and timing of Nyah's injuries would change if he knew that Dockery had expressed her intention to assert her privilege against self-incrimination if called to testify at trial.

Appellant's supposition here concerning the basis for Dr. Walker's opinion about the nature, causes, and timing of Nyah's injuries is simply mistaken. Dr. Walker did not rely on any opinion about who actually caused Nyah's injuries in forming his opinion about the nature, causes, or timing of these injuries. As his testimony, both on direct examination and cross-examination, makes clear, the bases for his opinions

about the nature of the injuries Nyah suffered were the medical reports of the other doctors who examined and treated Nyah, his own examination of Nyah, and Nyah's medical history, which he learned in part from Dockery. His opinion that Nyah's injuries were caused by shaking was based on his conclusion that Nyah suffered certain types of injuries, along with his expert opinion that injuries of this sort are almost exclusively caused by shaking. Similarly, Dr. Walker's opinion that Nyah's symptoms would have manifested shortly after the injuries were caused was based on his conclusions about the types of injuries Nyah suffered. As a result, Dr. Walker's opinions concerning the nature, causes, and timing of Nyah's injuries were not based on any opinion concerning who inflicted the injuries. Consequently, evidence of Dockery's intention to assert her Fifth Amendment privilege against self-incrimination would not tend to undermine the bases for Dr. Walker's opinions concerning the nature, causes, or timing of Nyah's injuries by undermining his opinion concerning who inflicted Nyah's injuries, as Dr. Walker's opinions about the nature, causes, and timing of Nyah's injuries were not based on any such opinion about who inflicted the injuries. Therefore, it was not relevant for the purpose for which it was offered, and the trial court properly prohibited appellant from asking Dr. Walker about this evidence on cross-examination. Moreover, the trial court correctly observed that Dr. Walker could not testify as to who *caused* the injuries.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**