982 A.2d 850

**Anthony DICKSON a/k/a Robert Louis Dixon**

v.

**STATE of Maryland.**

**No. 2521, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 28, 2009.

490

**493**

Bradford C. Peabody (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

DEBORAH S., EYLER, MEREDITH, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Baltimore City convicted Anthony Dickson, a/k/a Robert Louis Dixon, the appellant, of first-degree murder and carrying a weapon with intent to injure in the shooting death of 16–year–old Robert "Butch" Martin. The court imposed a life sentence for the murder conviction and a consecutive sentence of three years for the weapon conviction.

The appellant raises two questions for review, which we quote:

I. Was it error to deny the motion for mistrial, after witness Christina Thomas was improperly coerced by the court, in front of the jury, into testifying for the State, in violation of Appellant's due process rights?

II. Did the trial court err in proceeding with a portion of the trial, during the illness of Appellant's counsel?

For the following reasons, we shall answer Question I affirmatively, reverse the judgments of conviction, and remand for further proceedings. As Question II is unlikely to resurface on remand, we shall not address it.

## FACTS AND PROCEEDINGS

On the evening of January 1, 2006, Butch Martin was killed by a shotgun blast to the head as he was sitting in the back seat of a white Dodge Intrepid owned by Christina Thomas, his girlfriend. The car was parked with the key in the ignition in front of 2600 Marbourne Avenue, in Baltimore City. Martin was alone when he was shot. He was sitting in the back seat because the front seat doors to the car were broken.

When he was shot, Martin was talking on a cell phone to his mother, Roberta Martin. According to Mrs. Martin, her son called her because he was upset that she had not let her friend lend him a gun. He said on the phone that "Bobby" was coming up the street and that it looked like "Bobby" had a gun. Mrs. Martin "fussed," telling her son to "just walk away," and then she heard a loud sound, like a shot fired. Her son would not respond and he did not answer when she called back. She then got a call from Thomas, who was screaming and crying, and another woman got on the phone and told her that her son had been shot.

The day after the murder, on January 2, 2006, and again on January 25, 2006, Thomas gave audiotaped statements to the police.

Two men were arrested and charged in Martin's murder: Michael McFadden and the appellant, nicknamed "Bobby." McFadden and the appellant were tried separately, with McFadden's trial taking place in June 2007 and the appellant's trial taking place about four months later, in late September/early October of the same year. McFadden was convicted by a jury of second-degree murder and carrying a concealed dangerous weapon. The court imposed a 30–year prison term for the murder and a consecutive three-year prison term for the weapon conviction. On appeal, this Court reversed

McFadden's weapon conviction.[1]  *McFadden v. State,* 186 Md.App. 738 (2009).

In the *McFadden* trial, Thomas testified for the State.[2]  She said she and Martin had spent most of January 1, 2006, "riding around" in her car.  She was driving.  Sometime in the evening, she decided to visit her best friend Amber,[3] who was living at 2600 Marbourne Avenue.  After she parked her car in front of Amber's house, she and Martin sat and talked for about four minutes.  Then Thomas saw a man she identified as "Bobby" drive by in a red Cadillac.  She did not see anyone else in the Cadillac at that time.  She got out of her car and entered Amber's house.

About two minutes later, Thomas heard a gunshot.  She ran outside and saw a "big hole" in the rear driver's side window of her car, and saw the same red Cadillac speeding down the street with "Bobby and Mike" inside.  She did not see their faces, but claimed she could identify them from the backs of their heads.  "Bobby" was the appellant and "Mike" was McFadden.  Thomas tried to get inside the car to check on Martin but the doors would not open because they were locked and the key was in the ignition.  Several of her friends arrived and used a hammer to break the rear passenger side window and found Martin dead from a gunshot to the head.

Also in her *McFadden* trial testimony, portions of the taped statements Thomas had given the police were read into evidence.  In one part of her January 2, 2006 statement, she said that Martin and the appellant had been involved in an altercation in December 2005, during which the appellant had threatened to kill Martin.  She also described seeing the appellant shoot a large green gun in an alley in the "New Orland" area of Baltimore City on New Year's Eve, the night before the murder.  In one part of her January 25, 2006 statement that

---

1.  McFadden did not challenge the murder conviction.

2.  The *McFadden* trial took place in a courtroom that was equipped with video and audiotape recording equipment.

3.  Thomas could not remember Amber's last name.

was read into the record, Thomas admitted that part of her January 2 statement, in which she said she was looking out the window and saw the shooting as it occurred, including the red Cadillac, was not true. In her *McFadden* testimony, Thomas repeated that she had not told the truth about that point in her January 2, 2006 statement, but that everything else she had said in her statements to the police was true.

At the trial in the case at bar, defense counsel in opening statement told the jurors they would hear evidence that would lead them to conclude that Thomas committed the murder by orchestrating a "hit" and that the appellant was uninvolved.

The prosecution called police officer witnesses who testified that, on January 1, 2006, at about 9:50 p.m., they responded to 2600 Marbourne Avenue where they found a white Dodge Intrepid with its motor running and both back windows broken out. A broken hammer and a spent shotgun shell were on the ground next to the car. Martin's body was in the back seat, on the driver's side. He was dead with a large shotgun wound to the head. He was holding a cell phone in his right hand. He had an unloaded .38 caliber handgun in his right, front pants pocket. People at the scene reported that, after hearing the gunshot and seeing the hole in the car window, they had used the hammer to break into the car. Thomas was at the scene and was "extremely distraught."

The police witnesses further testified that, in response to information obtained in their investigation, they went to the 2700 block of Norland Road, also in Baltimore City, and found five spent shotgun shells in the alley. The shells were similar to each other and to the shell found next to Thomas's car. Upon obtaining a search warrant for a residence at 3903 Edmondson Avenue, the police recovered a loaded shotgun in the backyard, near the steps to the basement. Parked in front of that address was a maroon Cadillac with a large Christmas bow on the front grill. The appellant's fingerprints were found on a CD inside the Cadillac.

As we shall explain, *infra*, Thomas was called as a State's witness in the trial in the case at bar. Initially, she refused to

be sworn; then, after being sworn, she recanted most of her prior testimony. Her prior recorded testimony in the *McFadden* trial was played for the jury in the appellant's trial.

Also at the trial in the case at bar, Thomas's full taped statements to the police of January 2 and January 25, 2006, were played for the jury. In the January 25 statement, she told the police that not long after the murder she was detained on unrelated charges at the Baltimore City Central Booking and Intake Facility ("Central Booking"), where she was approached by a correctional officer whom she recognized as the appellant's mother. The appellant's mother told her she "better not go to court," which scared her. On the day of Thomas's testimony in the case at bar, the appellant's mother was a spectator in the courtroom. When asked on cross-examination whether she saw the appellant's mother in the courtroom, Thomas said she did not. The appellant's mother was identified when defense counsel asked her to stand up. The trial judge did not know that the appellant's mother was present in the courtroom during Thomas's testimony.

We shall include additional facts as pertinent to our discussion of the issues.

## DISCUSSION

### I.

### (a)

On October 1, 2007, the State called Thomas as a witness in the appellant's trial. At that time, she was incarcerated at the Baltimore City Detention Center. She was brought in on a writ of *habeas corpus ad testificandum*. The jurors did not know any of that background information.

When the clerk attempted to administer the oath to Thomas, she refused to be sworn. The following exchange then took place in front of the jury:

THE WITNESS: I wish to remain silent. I'm not saying nothing.

THE COURT: Okay. . . . [M]a'am, I'm ordering you to take the oath and testify—do you understand that—under penalty of contempt?

THE WITNESS: [4] I have a right not to testify.

THE COURT: You have no rights, ma'am.

THE WITNESS: Yes, I do have rights.

THE COURT: You have those rights that I give you. You have no Constitutional right not to answer.

THE WITNESS: Yes, I do. I have a right to remain silent.

THE COURT: Okay.

THE WITNESS: Yes, I do.

THE COURT: Okay. Take this jury back in the jury room for a moment please.

After the jurors were escorted out, the following colloquy took place:

THE WITNESS: I want to get me an attorney please.

THE COURT: Ma'am, on what basis do you believe you have a Fifth Amendment Right not to testify.

THE WITNESS: That's why I need to get me a lawyer.

THE COURT: Okay.

THE WITNESS: Because I wish—I know I have the right to remain silent.

THE COURT: Okay. Ma'am, I'm ordering you now not having been unable [sic] to articulate a Fifth Amendment Right not to testify,—and I know of none based on what I've heard—every time you refuse to testify I'm going to cite you [for] contempt and impose a six month sentence and that sentence will be served consecutively to any sentence you are now serving.

Every time you refuse to answer a question, send this jury out and I'm going to impose another six months

---

**4.** From this point on, the transcript incorrectly identifies Thomas as "THE DEFENDANT" instead of as "THE WITNESS." We have corrected that error for clarity only.

consecutive. You could very well wind up doing decades because of your refusal to testify. Do you understand that? Do you understand that?

THE WITNESS: No.

THE COURT: In other words, you refuse to answer a question I'm going to send this jury out and I'm going to give you six months, holding you in contempt. Each time you refuse to answer a question I'm going to ask you again—order you to answer and I'm going to send this jury out and I'm going to give you another six months.

THE WITNESS: Okay. What about my right for me being threatened and everything? What about my rights?

THE COURT: I'm telling you you must answer.

THE WITNESS: What about my rights?

THE COURT: Ma'am, next time you interrupt me I'm giving you six months consecutive. I don't know what other judges you've been in front of, but you're in front of [this Judge] now. I don't play. Bring this jury out. Next time I pause and you interfere with these proceedings I'm giving you six months just like I said.

THE WITNESS: Well, don't I have a right to get a lawyer or an attorney?

THE COURT: The answer is no.

At that point, defense counsel sought permission to approach the bench, but the court refused. The judge asked counsel, "Do you know of any Constitutional right of her not testifying?" The prosecutor said, "No, Your Honor. She is not a suspect in this case." Defense counsel asked "to put a motion on the record" but was told he could "do it later."

The jurors were brought back into the courtroom and the clerk administered the oath to Thomas. When asked to swear that she would speak truthfully, Thomas said, "I guess so." The trial judge directed her to answer yes or no. She then said, "Yeah, I will tell the truth."

On direct examination, Thomas testified that she did not remember anything about January 1, 2006; she did not have

occasion to talk to the police that night or the following day; and she did not give any statements to the police. The prosecutor asked for and was granted permission to play the recording of Thomas's January 2, 2006 statement. As the tape was about to be played, Thomas yelled out, "Can I say something? The detectives forced me to say everything that's on that tape." The trial judge commented, "Ma'am, I thought you just said you didn't give a statement?" Thomas replied, "They forced me ..." The tape started to play, but had to be stopped because of a technical problem.

During the pause, defense counsel again asked to approach, and the following ensued:

[DEFENSE COUNSEL]: Your Honor, first of all, I move for a mistrial. The reason I move for a mistrial [is] because the State knew all along that that's what this witness was going to do. This could have been resolved out of the presence of the jury.

THE COURT: Quite the contrary. This is a *Nance* situation.[5]

[DEFENSE COUNSEL]: Right.

THE COURT: And she just admitted sue sponte [sic] without a question that the police made her say what was on that tape. She converted it into [court takes brief telephone call].

[DEFENSE COUNSEL]: I'm making two motions, Your Honor, very brief. One is a mistrial. Had the State alerted the court to have a hostile witness—she [the prosecutor] knew that all along as recently as 30 seconds before the witness took the stand. To have her get on the stand and go through this circus before the jury, very prejudicial to my client. The jury is obviously going to think that she's trying to cover up to help him.

I think Your Honor's position could have brought home to her out of the presence of the jury and (inaudible) would not

---

5. Referring to *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993).

have been subjected to this spin-off of this conduct of this witness on the stand. And that's my motion for a mistrial.

The court inquired whether counsel had known in advance that Thomas was going to refuse to testify. Defense counsel said he had not. The prosecutor said that Thomas had told her that day that she was not going to testify. When the prosecutor then told her she had to do so, Thomas "shook her head." The prosecutor explained that, because Thomas had been a cooperative witness up to that point, having testified willingly in the *McFadden* trial, she thought, "I'll give her a minute maybe, you know, she recognizes she needs to testify." The court interjected at that point that Thomas had no choice in the matter because she had no right not to testify. Defense counsel argued that Thomas could have such a right because of possible perjury in her *McFadden* testimony, or a possible charge of giving a false statement to the police, and said he was moving for a mistrial on that second ground as well. The court denied the mistrial motion on both grounds.

The technical problem was cured and the tape recording was played and moved into evidence. Thereafter, Thomas testified that it was not her voice on the tape recording and that she did not speak to the police on January 2, 2006. That concluded her direct examination.

On cross-examination, defense counsel elicited prior convictions for first-degree assault and drug distribution, and questioned Thomas as to whether she understood that she was under oath and had to tell the truth. She said she understood. She testified that she had nothing to do with the murder; that she had not gone to Amber's house on the night of January 1, 2006; that Martin was not locked in the back seat of her car; that he was not in her car at all; that she remembered nothing about going to Amber's house that night; that she did not tell the police that she went to Amber's house that night; that she "didn't see no Cadillac"; that she had never seen the Cadillac in question before; that there was no prior altercation between the appellant and Martin; and that she had not told the police there was a prior altercation. After acknowl-

edging that Martin was her boyfriend and she had been pregnant by him at the time of his death, Thomas agreed that she would "jump at the chance to nail" the person who had killed him.

Thomas went on to testify that she was in bed asleep on the evening in question and that she has never been to Amber's house. When questioned about excerpts from her testimony in the *McFadden* trial, she acknowledged the truth of her "I don't know" or "I'm not sure" answers, and recanted everything else, saying she did not remember any of what she had testified about. She further testified that whatever she may have told the police was not the truth; she only communicated with them because they had threatened to charge her with murder.

On redirect examination, Thomas recanted her January 25, 2006 taped statement to the police, saying she never was threatened by the appellant's mother. That tape then was moved into evidence and played for the jury. Thomas denied that it was her voice on the tape. On recross, defense counsel established that Thomas would recognize the appellant's mother if she saw her, and then asked whether she saw the appellant's mother in the courtroom. Thomas said she did not. Defense counsel then turned to the appellant's mother, who was seated in the courtroom, and asked her to stand and identify herself, which she did.

The following day, at the request of the State, the videotape of Thomas's testimony in the *McFadden* case was played for the jury.

Before Thomas was called to testify, the trial judge already knew, from reviewing the arraignment sheet for the case and from discussions with counsel, that McFadden had been tried and convicted of charges arising out of the same shooting death and that Thomas had been the key witness against him. The judge also knew that the appellant's mother had threatened Thomas that "she better not come to court," and had been charged with witness intimidation. As we previously noted, the judge did not know that the appellant's mother was

present in the courtroom that day. He also did not know that Thomas was going to recant her prior testimony.[6]

### (b)

In his first contention, the appellant maintains that the trial court erred when, in front of the jury, it "coerced" Thomas into testifying and when, with the jury not present, it continued to "coerce" her by threatening her with "decades" of contempt sentences; and that the court's doing so amounted to a violation of his due process right to a fair trial. In particular, he asserts that Thomas was not a "compellable" witness because, if she were to testify consistent with the defense theory of the case, as forecasted to the jurors in opening statement, that she "set Martin up" to be killed, she would be implicating herself in a murder; there was evidence that the police had threatened to charge her with Martin's murder if she did not cooperate with them; and there was no proffer of a plea bargain or any immunity agreement between the State and Thomas.

The appellant further asserts that, even if Thomas was a "compellable witness," the trial court's advisement about contempt was not neutral and objective. Ultimately, Thomas's inconsistent testimony resulted in her recorded statements to the police and her prior testimony in the *McFadden* case being played for the jury. He points out that this case was close, factually, as after two and one-half days of testimony, the jurors deliberated for two full days before reaching a

---

**6.** Pending this appeal, the State filed a motion to supplement the record by means of an affidavit by the trial judge and a separate affidavit by the prosecutor on the case. The motion was not opposed and was granted. The motion explained that, during parts of the preliminary discussions during trial, and also for some parts of the trial, the court's regular recording system did not function. A backup audio-only tape did pick up some of the discussions between the court and counsel during that time. Unfortunately, the backup audiotapes were not "tagged" as belonging to the appellant's case. The trial judge and his law clerk found them by poring over the backup audiotapes for other trials, to the point where they could hear discussions among the court and counsel in the case at bar. The audiotapes now are part of the record in this case.

verdict; therefore, it cannot be said that any error by the court was harmless.

The State counters that the issue of "coercion" by the trial judge was not raised below and therefore was not preserved for review on appeal. It maintains that the issue lacks substantive merit, moreover, because Thomas indeed was a "compellable witness"; the trial judge's explanation to her about the consequences of refusing to testify was accurate; and the court did nothing that reasonably could have influenced the substance of the testimony Thomas in fact gave.

## (c)

■ We first address the State's non-preservation argument. According to the State, in the appellant's mistrial motion, he challenged 1) the trial court's response, in front of the jury, to Thomas's initial refusal to testify; and 2) the trial court's ruling that Thomas did not have a Fifth Amendment claim of privilege as a witness in the appellant's trial. The State asserts that, on appeal, the appellant is arguing that the trial court's conduct in responding to Thomas's attempt to invoke her Fifth Amendment privilege amounted to "coercing" her to testify by threatening to hold her in contempt every time she did not answer a question posed to her.

■ To be sure, Maryland law is clear that, when a challenge is made to a circuit court's ruling on appeal, it must be made on the same ground as was presented below. A party may not for the first time on appeal attack a court's ruling upon a ground the party did not put before the court below. *See Anderson v. Litzenberg*, 115 Md.App. 549, 569, 694 A.2d 150 (1997) ("If counsel provides the trial judge with specific grounds for an objection, the litigant may raise on appeal only those grounds actually presented to the trial judge. All other grounds for the objection, including those appearing for the first time in a party's appellate brief, are deemed waived."). *See also* Md. Rule 4–323 (method of making objections); Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have

been raised in or decided by the trial court. . . ."). We disagree, however, with the State's argument to that effect in the case at bar.

During a pause at the start of Thomas's testimony, defense counsel moved for a mistrial, arguing that the prosecutor had called Thomas to the stand with the knowledge that she would not testify, and that the ensuing "circus" prejudiced the appellant by suggesting to the jury that Thomas was covering up for him.[7] Defense counsel further protested that the situation could have been avoided if "[the trial judge's] position . . . ha[d] [been] brought home to [the witness] outside the presence of the jury." Before ruling on the motion, while questioning counsel, the trial judge remarked that Thomas had no Fifth Amendment right to refuse to testify. Defense counsel disagreed, noting that if she testified truthfully in the case at bar she could be prosecuted for perjury or giving false statements based on her testimony in the *McFadden* trial and prior statements to police, respectively, and moved for a mistrial on that ground as well. The court denied the mistrial motions.

We think these arguments were sufficient to preserve for review the entirety of the trial court's decision-making respecting Thomas's refusal to testify. Although the appellant frames the issue on appeal as whether the trial court "improperly coerced" Thomas into testifying, his arguments are essentially that (1) Thomas properly invoked her Fifth Amendment right to remain silent, and therefore should not have been compelled to testify by threats of contempt; and (2) the trial judge's overly harsh treatment of Thomas before the jury was prejudicial to him. These arguments, although not matching in every detail, are substantially similar to the arguments made by the appellant before the trial court, and thus are preserved for review.

---

7. The appellant had attempted to make a motion earlier, while the trial judge was warning Thomas that he would hold her in contempt for refusing to testify, and the judge refused to hear the motion, telling the appellant he could "do it later."

**(d)**

■ Among other things, the Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself." [8]   U.S. Const. amend. V. In a jury trial, when a witness invokes his Fifth Amendment right against self-incrimination, or it is known that he will do so, the court must determine whether the witness's invocation of that right is proper, *i.e.,* whether the witness is "compellable." [9] *See Hoffman v. United States,* 341 U.S. 479, 487–88, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (reversing contempt conviction of witness who invoked the Fifth Amendment during grand jury racketeering investigation proceedings, on the ground that court should have accepted the invocation); *Simmons v. State,* 392 Md. 279, 297, 896 A.2d 1023 (2006) ("It is the duty of the trial judge to determine whether the witness can properly assert the privilege against self-incrimination and whether the witness's silence is justified."). *See also Smith v. State,* 394 Md. 184, 211, 905 A.2d 315 (2006); *Bhagwat v. State,* 338 Md. 263, 271–72, 658 A.2d 244 (1995).

■ The substantive standard guiding the court's inquiry is whether there is reasonable cause for the witness to fear self-incrimination from a direct answer to the question posed, or from an explanation of the failure to answer, and whether the danger of self-incrimination is evident from the nature of the question and the circumstances of the case. *See Choi v. State,* 316 Md. 529, 536–37, 560 A.2d 1108 (1989). The Court of

---

**8.** The Fifth Amendment is made applicable to the states through the Fourteenth Amendment. *Smith v. State* 394 Md. 184, 210, 905 A.2d 315 (2006). Article 22 of the Maryland Declaration of Rights similarly provides in part that "no man ought to be compelled to give evidence against himself in a criminal case."

**9.** In *Archer v. State,* the Court of Appeals explained that the witness in question was "compellable" because he was asked to testify about crimes for which he already had pleaded guilty, been sentenced and convicted, and the time for filing leave to appeal the guilty plea had expired. 383 Md. 329, 344, 859 A.2d 210 (2004). In other words, the court could compel the witness to testify because the subject matter on which he was being questioned posed no risk of further self-incrimination.

Appeals has noted its consistent adherence to this standard, which it derived from *Hoffman, supra:*

> We have consistently applied the *[Hoffman* standard], that a witness is entitled to invoke the privilege against self-incrimination if "the witness has reasonable cause to apprehend danger from a direct answer" and that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

*Id.* (quoting *Hoffman,* 341 U.S. at 486–87, 71 S.Ct. 814) (internal citations omitted). *See also Richardson v. State,* 285 Md. 261, 267, 401 A.2d 1021 (1979) ("[The] continued vitality [of the Hoffman standard] has been recognized both by the Supreme Court of the United States, and the courts of this State." (citations omitted)).

Although attributed to the Court in *Hoffman,* this test, in similar form, dates as far back as the treason trial of Aaron Burr, in which Chief Justice Marshall explained:

> It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be; and if he say, on oath, that he cannot answer without accusing himself, he cannot be compelled to answer.

*United States v. Burr,* 25 F. Cas. 38, 40–41 (C.C.D.Va.1807).

Much more recently, the Court of Appeals has framed the test as a two-part inquiry: "The test of the witness's entitlement to invoke the privilege against self-incrimination [is] (1) whether there is a reasonable basis for the invocation of the privilege; and (2) whether the privilege is invoked in good faith[.]" *Bhagwat,* 338 Md. at 272, 658 A.2d 244. *See also*

*Simmons,* 392 Md. at 298, 896 A.2d 1023; *Gray v. State,* 368 Md. 529, 553, 796 A.2d 697 (2002).

The mere fact that the witness is asserting that he or she would be incriminated by answering the question does not excuse the witness from doing so. *Simmons,* 392 Md. at 297, 896 A.2d 1023. "It is for the court to say whether [the witness's] silence is justified, and to require [the witness] to answer if 'it clearly appears to the court that he is mistaken.' " *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814 (quoting *Temple v. Commonwealth,* 75 Va. 892, 899 (1881)) (internal citation omitted). The trial judge's assessment should consider the "totality of the circumstances," *Smith,* 394 Md. at 213, 905 A.2d 315, and "must be governed as much by his [or her] personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* at 211, 905 A.2d 315 (quoting *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814). When there are two (or more) reasons for a witness to invoke the Fifth Amendment, and only one of them is proper, an assessment of whether the witness is claiming the privilege in good faith is not enough; the court must also determine which reason is actually motivating the witness. *Bhagwat,* 338 Md. at 279–80, 658 A.2d 244.

The Fifth Amendment privilege against self-incrimination "must be accorded liberal construction." *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. *See also Choi,* 316 Md. at 536, 560 A.2d 1108 ("This Court has repeatedly emphasized that the privilege against compelled self-incrimination, under both the Fifth Amendment and Art. 22 of the Declaration of Rights, must be accorded a liberal construction in favor of the right that it was intended to secure." (quotation marks and citations omitted)). Thus, for a trial court to rule that the privilege does not apply, it must be " '*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answers *cannot possibly* have such tendency' to incriminate." *Hoffman,* 341 U.S. at 488, 71 S.Ct. 814 (quoting *Temple v. Commonwealth,* 75 Va. 892, 898 (1881)) (emphasis in original). If, however, the

witness persists in refusing to answer a question after the court has decided the Fifth Amendment privilege does not apply, the witness may be convicted of direct criminal contempt. *Gardner v. State*, 10 Md.App. 691, 695–96, 272 A.2d 410, *cert. denied*, 261 Md. 724 (1971). *See also Dorsey v. State*, 295 Md. 217, 224, 454 A.2d 353 (1983) (explaining that direct contempt occurs when the contemptuous action occurs "within the sensory perception of [the] presiding judge" and "interrupt[s] the order of the courtroom") (quoting *State v. Roll and Scholl*, 267 Md. 714, 734, 298 A.2d 867 (1973).

■ The Court of Appeals in *Bhagwat* set forth the procedure a trial court must follow to decide whether a claim of Fifth Amendment privilege is proper:

> [B]ecause the privilege is not a prohibition of inquiry, but is an option of refusal, the witness should first be called to the stand and sworn. Interrogation of the witness should then proceed to the point where he or she asserts his or her privilege against self-incrimination as a ground for not answering a question. If it is a jury case, the jury should then be dismissed and the trial judge should attempt to determine whether the claim of privilege is in good faith or lacks any reasonable basis. If further interrogation is pursued, then the witness should either answer the questions asked or assert his or her privilege, making this decision on a question by question basis.

338 Md. at 271–72, 658 A.2d 244 (citations and quotation marks omitted). When it is clear in a jury trial that the witness will invoke the privilege if called to testify, however, the witness should be called and sworn and questioned before or by the court outside the presence of the jury. *Id.* at 273, 658 A.2d 244. *Cf. Gray v. State*, 368 Md. at 558–59, 796 A.2d 697 (addressing circumstances in which a defendant can call a witness to invoke the Fifth Amendment in front of the jury).

■ A failure by the trial court to conduct the proper inquiry into a witness's refusal to testify (or a failure to conduct any inquiry at all) may constitute reversible error. *See Bhagwat*, 338 Md. at 280–81, 658 A.2d 244; *Smith*, 394

Md. at 212–14, 905 A.2d 315.  In *Bhagwat,* the Court held that the trial judge erred by failing to determine the basis for the witness's invocation of the Fifth Amendment.  338 Md. at 280–81, 658 A.2d 244.  Although there was sufficient evidence on the record to conclude that the witness properly had invoked his Fifth Amendment privilege to avoid self-incrimination, it also was plausible that he had invoked the privilege to comply with the terms of an improper plea agreement.  *Id.* at 278–79, 658 A.2d 244.  The Court held that a brief statement by the witness's counsel that the witness was refusing to testify, made without the witness present in the courtroom, was insufficient;  instead, it was "incumbent on the trial court to inquire as to which of the reasons given [was] the real reason for the refusal [to testify]."  *Id.* at 280, 658 A.2d 244.

In *Smith,* an appeal by a witness held in direct criminal contempt for refusing to testify, the Court held that the trial judge erred by not conducting the Fifth Amendment privilege inquiry as required and instead deciding the privilege question summarily.  394 Md. at 212–14, 905 A.2d 315.  In making its decision on the validity of the asserted privilege, the trial court among other things did not consider the totality of the circumstances.  *Id.* at 213, 905 A.2d 315.  The Court vacated the witness's criminal contempt conviction but did not remand the matter to the trial court for it to conduct a proper inquiry on the claim of privilege because the trial in which the witness had been called to testify was over and could not be reopened.  *Id.* at 216–17, 905 A.2d 315.

Accordingly, in this case, we cannot evaluate whether Thomas properly asserted her Fifth Amendment right to silence without first examining whether the trial court conducted its own assessment consistent with the standards and procedures outlined above.  The State, other than asserting generally in its brief that Thomas was a compellable witness who did not have a reasonable basis to remain silent, does not advance a particular argument that the trial judge determined, and determined properly, that Thomas did not have a reasonable basis to invoke the Fifth Amendment.  The State does expressly assert, however, that the trial court found that Thomas

was not acting in good faith in asserting the claim of privilege and on that basis ordered her to answer the questions posed. From our review of the record, it is clear that when Thomas claimed a right not to testify, the trial judge did not conduct an inquiry on whether she had a reasonable basis for the claim, or asserted it in good faith, nor did the trial judge make findings on either issue. Instead, the trial judge began its privilege inquiry (with the jurors still present) by merely instructing Thomas, incorrectly, that as a witness she simply had no constitutional rights to exercise unless he decided that she did.

The materials added to the record pending this appeal, consisting of affidavits by the trial judge and the prosecutor, emphasize that the judge knew before Thomas took the stand that she had not invoked the Fifth Amendment at McFadden's trial, and indeed had testified at length against him, as the State's star witness. That is of no moment, however. The law is well established that a person's waiver of his or her Fifth Amendment privilege in one trial or proceeding does not preclude him or her from asserting the claim of privilege as to the same subject matter in a subsequent trial or proceeding. *See United States v. Yurasovich*, 580 F.2d 1212, 1220 (3rd Cir.1978) ("It is well settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert ... the privilege as to the same matter in a subsequent trial or proceeding."). *See also United States v. Goodman*, 289 F.2d 256, 259 (4th Cir.1961) (and cases cited therein), *vacated on other grounds*, 368 U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961). To the extent that Thomas had a Fifth Amendment right to silence to waive, the fact that she testified at McFadden's trial did not require her to testify at the appellant's trial.

Because the trial court pre-decided that Thomas was a "compellable" witness, *i.e.*, that she had no reasonable basis for her claim of privilege and/or was not acting in good faith in asserting it, without holding a hearing to elicit evidence on

those topics and make findings on reasonable basis and good faith, the court erred.

The appellant's primary factual defense at trial was that Thomas was the moving force behind her boyfriend's murder; that she had planned and orchestrated it, and he had nothing to do with it. His only connection to the crime, he argued, was that Thomas was blaming him to cover for herself. In opening statement, defense counsel made plain that this was the defense theory of the case, and, in examining witnesses, that is the tactic defense counsel followed. His questions were framed to suggest that Thomas's behavior on the night of the murder was suspicious: she went inside Amber's house without the victim, even though they were visiting to get something to eat; she left the victim alone in her car, which was difficult to get out of because of its broken doors, and where he would be an easy target; and the shooting took place within moments of Thomas's reaching a place of safety in Amber's house. Given that the defense theory of the case was to blame Thomas for the crime the appellant was on trial for, it was incumbent upon the trial judge to assess whether the appellant's theory of defense itself was a reasonable basis for Thomas to invoke the Fifth Amendment. Yet, the trial judge inexplicably concluded, without evidence or inquiry, that, "based on what [he had] heard," Thomas had no Fifth Amendment right.

The State takes the position that it was sufficient that the prosecutor announced, in response to the trial judge's question about Thomas's role in the events underlying the murder, that Thomas was not a suspect in the case. We agree with the appellant, however, that Thomas was afforded no protection by that assertion alone. To truly protect Thomas, the State would have had to enter into an immunity agreement with her. There is no evidence in the record that the State attempted to do so, or had any interest in doing so.

██ In its brief in this Court, the State offers several reasons why Thomas's claim of privilege was not made in good faith. First, the State notes that the trial judge was aware of

several "peculiarities of the case" that would suggest that Thomas was not acting in good faith, including: that Thomas had testified in the *McFadden* case and was the only eyewitness to the crime; that the appellant's mother had threatened Thomas not to testify against the appellant; and that Thomas was incarcerated for a probation violation at the time of the appellant's trial. Second, the State argues that Thomas's "statements and demeanor on the stand" were enough to demonstrate that she was not acting in good faith. Specifically, the State points out that Thomas did not offer fear of self-incrimination as an answer when the court asked her why she believed she had a Fifth Amendment right not to testify,[10] and that she later indicated to the court that her reluctance to testify was due to the threat made by the appellant's mother. These may indeed be grounds to conclude that Thomas was not claiming the Fifth Amendment privilege in good faith, but because the trial court did not conduct an inquiry or make findings to that effect on the record, the State's arguments amount to mere speculation.[11]

The State's argument that Thomas refused to testify because of the threat made against her by the appellant's mother also raises another unresolved question: Did Thomas wish to remain silent because the appellant's mother intimidated her, or because she feared her testimony might incriminate her in Martin's murder? As in *Bhagwat,* here there were at least two possible reasons for Thomas to remain silent, one proper (the latter reason) and one improper (the former reason). Thus, the trial court needed to determine which reason actually was motivating Thomas to claim the Fifth Amendment.

---

**10.** When the trial judge asked "on what basis do you believe you have a Fifth Amendment Right not to testify?" Thomas responded, "That's why I need to get me a lawyer," and "Because I wish—know I have the right to remain silent."

**11.** Because it is the duty of the trial judge to assess the witness's Fifth Amendment claim, *Simmons,* 392 Md. at 297, 896 A.2d 1023, we cannot perform this task *post hoc.* Rather, when possible, we must remand the case to the trial court so that it may conduct an independent inquiry. *Smith,* 394 Md. at 216, 905 A.2d 315.

To resolve these various uncertainties, the trial court's consideration of the totality of the circumstances should have included an inquiry and findings on, among other questions: 1) What criminal law consequence, if any, did Thomas fear from answering the proposed questions? 2) Did Thomas know that, in the case at bar, unlike in the *McFadden* case, the defense theory was that she had masterminded the murder? 3) What if any evidence existed to support the defense theory that Thomas had planned the murder? [12] 4) Was there a reason Thomas had not asserted the privilege during the *McFadden* trial but was asserting it during the trial in the case at bar? and 6) Was Thomas asserting the privilege to protect herself against "stop snitching" retaliation that might follow, most notably from the appellant's mother, if she testified against him? Without knowledge of these and other factual issues, the court could not properly decide whether Thomas had a reasonable basis to invoke the privilege, and did so in good faith.

The State argues that, because the Fifth Amendment right is personal, even if the trial court erred in directing Thomas to answer the questions posed to her, the error affected Thomas, not the appellant. In other words, any violation of Thomas's constitutional right not to testify in the course of this trial does not translate into a violation of any of the appellant's rights, including his right to due process. It is in anticipation of this argument that the appellant relies so heavily on *Archer v. State, supra,* 383 Md. 329, 859 A.2d 210.

---

12. This question is particularly important given that the defense's theory that Thomas orchestrated the murder itself could have induced Thomas's refusal to testify by making her fear self-incrimination. In such a situation, when a key State's witness is being implicated by the defense in the crime for which the defendant is on trial, it is imperative that the trial court determine whether the defense theory has any evidentiary support, and thus may be a reasonable basis for the witness's refusal to testify. Otherwise, a defendant could simply block the testimony of an adverse witness with an unsubstantiated claim that it was the witness who was responsible for the crime. Of course, the State also could remedy this problem by offering a witness in that situation immunity for his or her testimony against the defendant.

At trial in the *Archer* case, the judge was confronted by a reluctant witness for the State. *Id.* at 338, 859 A.2d 210. The witness already had been tried and convicted of crimes arising out of the same shooting and murder that were the basis for the charges against Archer, and was serving a substantial prison sentence. *Id.* He also had testified for the State in the trial of a third co-defendant. *Id.* There was no dispute that the witness did not have a Fifth Amendment right to invoke. *Id.* at 344, 859 A.2d 210. Archer's first trial resulted in a mistrial because the witness refused to testify. *Id.* at 338, 859 A.2d 210. The witness claimed he had been stabbed in prison for testifying against the third co-defendant, and that he feared for his life if he testified against Archer. *Id.* 338–39, 859 A.2d 210.

The trial judge informed the witness (who was represented by counsel) that he had two options: He could continue to refuse to testify, be tried immediately for criminal contempt, and receive a sentence that had no maximum limitation except what would be cruel and unusual. *Id.* at 339–40, 859 A.2d 210. On the record, the judge contacted another judge and arranged that the contempt trial would go forward that day before that judge. *Id.* at 340–41, 859 A.2d 210. His second option, as explained by the judge, was to testify favorably to Archer, in which case the prosecution would be able to move into evidence the witness's prior testimony in the case against the third co-defendant, as prior inconsistent statements made under oath. *Id.* at 341–42, 859 A.2d 210. Counsel for the witness objected, complaining that the judge was inappropriately coaching the witness, and indeed coaching him to testify falsely. *Id.* at 342, 859 A.2d 210.

The witness still refused to testify, and was sent to the courtroom of the judge who was to try him for contempt, with directions to return after he had been convicted of contempt or if he changed his mind about testifying. *Id.* at 342–43, 859 A.2d 210. The witness returned to the original courtroom, saying that he would testify because he had no choice. He then took the stand and testified inconsistently with his testimony at the third co-defendant's trial. *Id.* at 343, 859 A.2d

210. The State moved into evidence the witness's prior inconsistent trial testimony. *Id.* at 348, 859 A.2d 210. Archer was convicted and appealed. *Id.* at 336, 859 A.2d 210. Ultimately, the case came before the Court of Appeals, which reversed the conviction. *Id.* at 361, 859 A.2d 210.

The Court held that the trial judge's advice to the witness about contempt sanctions and perjury was not a due process violation, *per se,* but was not given in a judicious manner and was otherwise excessive, warranting a new trial. *Id.* at 335–36, 859 A.2d 210. The Court concluded that the trial judge's "repeated admonition to [the witness] that he testify, irrespective of the witness's obligation to testify truthfully, coupled with the threats of contempt and possible imposition of the 'longest possible sentence the law allows,' probably caused the witness to change his testimony," thus violating Archer's right to a fair trial. *Id.* at 336, 859 A.2d 210.

There are similarities and differences between *Archer* and the case at bar. In both cases, one reason the witness may have been refusing to testify was fear of retribution. In both cases, the trial judges improperly used their contempt power as a means to intimidate the witnesses into testifying. In *Archer,* the trial judge threatened the witness with life imprisonment and called the judge who was to conduct the contempt proceedings in the presence of the witness. *Id.* at 350, 859 A.2d 210. Here, the trial judge warned Thomas that he could summarily impose consecutive six-month prison sentences each time she refused to answer a question, and thus she could receive "decades" of prison time for refusing to testify.

As the State notes, Maryland and federal law permits a judge "to convict summarily an individual for contempt multiple times during the course of a single proceeding" even when the sentences served consecutively would exceed six months. *See Smith v. State,* 382 Md. 329, 342 & n. 4, 855 A.2d 339 (2004) (and cases discussed therein). Nevertheless, as we explained in *Johnson v. State,* "a judge must act reasonably in finding a defendant guilty of contempt. A judge does not act reasonably ... when in anger he engages a

defendant in a dialogue that may provoke the defendant into further acts of contemptuous behavior." 100 Md.App. 553, 562, 642 A.2d 259 (1994). We think that imposing consecutive six-month sentences for each non-answer by Thomas, amounting to "decades" of incarceration, after it became clear that she was unwilling to testify, would have been unreasonable and an abuse of discretion.[13]

The two most significant distinctions between *Archer* and this case are that 1) unlike in *Archer,* where the witness plainly was compellable, here it was not clear that Thomas was a compellable witness; and 2) the trial judge here did not give Thomas advice that suggested that she testify untruthfully. For the former reason, the trial judge in this case erred by not making the necessary findings on that issue. For the latter reason, in this case, unlike in *Archer,* it was not likely that Thomas changed her testimony because of something the judge said to her. The trial judge's incorrect advice may have had the effect of causing Thomas to testify, but it probably did not cause her to testify contrary to her testimony in the *McFadden* case.

---

**13.** In *Johnson,* we vacated ten consecutive five-month and 29–day sentences for direct contempt, when "the trial judge, by engaging in a prolonged dialogue with the [defendant], may have provoked the [defendant] into repeatedly committing acts of contempt [which consisted of shouting expletives at the trial judge]." 100 Md.App. at 562, 642 A.2d 259. In *Smith,* however, the Court of Appeals affirmed separate contempt convictions for a series of profane outbursts. 382 Md. at 344, 855 A.2d 339. The Court distinguished *Johnson* based on the fact that the convictions did not result from "an extended, uninterrupted colloquy with the court [as in *Johnson];* rather, they resulted from distinct acts, separated in time and focus by at least several minutes of unremarkable, normal discussion or exchanges." 382 Md. at 341, 855 A.2d 339.

Although we cannot rule out the possibility of multiple contempt convictions for a refusal to testify "where the circumstances warrant it," *Johnson,* 100 Md.App. at 562, 642 A.2d 259, we are of the view that repeatedly posing questions to a reluctant witness and summarily imposing consecutive six-month prison terms each time the witness refuses to answer is more similar to the uninterrupted colloquy in *Johnson* than the distinct incidents in *Smith* and, therefore, under these circumstances, would have constituted an abuse of the court's contempt power.

We nevertheless conclude that, even though Thomas's claim of privilege was personal to her, and even though there are significant distinctions between this case and *Archer*, the trial court's error in summarily rejecting Thomas's claim of privilege likely prejudiced the appellant's defense, and therefore warrants a new trial. If Thomas properly invoked her Fifth Amendment right not to testify, so she was "unavailable," her prior testimony in the *McFadden* case and her two statements to the police would not have been admissible in evidence under Md. Rule 5–802.1(a) (allowing as an exception to the hearsay rule the introduction of a prior inconsistent statement by an *available* witness if the prior statement was "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition"). And, as an unavailable declarant, her testimony at McFadden's trial would not have been admissible as "former testimony," as the appellant, against whom the testimony now was being offered, had not had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Rule 5–804(b)(1). *See Archer*, 383 Md. at 347, 859 A.2d 210 ("If [the witness] had remained steadfast in his refusal to testify, his former [inconsistent] testimony would not have been admitted and the State would not have been able to introduce [his] prior statements as substantive evidence."). These were critical pieces of evidence against the appellant that would not have been admissible had the court concluded, based upon a totality of the circumstances, that Thomas had a reasonable basis for invoking the Fifth Amendment and was acting in good faith in doing so. Without a proper record to assess the legitimacy of Thomas's Fifth Amendment claim, however, we cannot determine whether the court's error was harmless.[14]

---

**14.** It is worth noting that when an unrepresented witness invokes the Fifth Amendment and refuses to testify, the trial court may appoint counsel to represent the witness in the necessary proceeding to determine whether the claim of privilege is reasonably based and made in good faith. *See, e.g., Smith v. State, supra,* 394 Md. at 192, 905 A.2d 315 (without any request, trial court appointed counsel for unrepresented witness, a prison inmate who invoked the Fifth Amendment when called to testify by the State in a criminal case).

## II.

As we have noted, the appellant's second contention is not likely to arise on remand and for that reason we shall not address it.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**